Herbert Kaufman v. Commissioner.
Kaufman v. Commissioner
Docket No. 88862.
United States Tax Court
T.C. Memo 1964-127; 1964 Tax Ct. Memo LEXIS 210; 23 T.C.M. (CCH) 747; T.C.M. (RIA) 64127; May 6, 1964
Stanley Worth, Transportation Bldg., Washington, D.C., and Scott P. Crampton, for the petitioner. Joseph N. Ingolia, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1950, 1951, 1952, *213 1953, and 1954 in the respective amounts of $157,813.75, $370,317.93, $305,342, $404,611, and $273,225.99; additions to tax under section 293(b) of the Internal Revenue Code of 1939 for the years 1950, 1951, 1952, and 1953 and under section 6653(b) of the Internal Revenue Code of 1954 for the year 1954 in the respective amounts of $78,906.88, $185,158.96, $152,671, $202,305.50, and $136,613; and additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for the years 1951, 1952, 1953, and 1954 in the respective amounts of $23,209.39, $18,142.85, $24,474.14, and $16,340.89. By amended answer respondent alleged that the deficiencies as determined by the Commissioner, after giving effect to the decision reached in Welsh Homes, Incorporated v. Commissioner, 279 F. 2d 391 (C.A. 4, 1960), affirming 32 T.C. 239 (1959), relating to ground rents, were as follows: Additions to tax under
Additions to tax un- § 293(b), IRC 1939
der § 294(d)(2),
and § 6653(b),
IRC 1939 (esti-
Year
Deficiency
IRC 1954
mated tax)
1950
$ 149,639.33
$ 74,819.67
1951
347,674.45
173,837.23
$21,850.78
1952
274,745.01
137,372.50
16,307.03
1953
372,339.67
186,169.84
22,537.86
1954
249,695.25
124,847.63
14,929.05
$1,394,093.71
$697,046.87
$75,624.72
*214 The issues for decision are: (1) Is the assessment of any deficiency in petitioner's income tax for each of the calendar years 1950 through 1954 barred by the statute of limitations. (2) Whether any part of the deficiency in income tax for each of the years 1950 through 1954 is due to fraud with intent to evade tax. (3) What is the correct amount of petitioner's income from the sale of properties during each of the years involved, particularly with reference to the following: (a) How should income be computed in each of the taxable years from transactions whereby petitioner delivered a deed to the purchaser who placed a mortgage on the property, the proceeds of which were paid to petitioner, which property had previously, either prior to 1950 or subsequent thereto, been the subject of a land installment sales contract between petitioner and the purchaser. (b) Should any amount be included in petitioner's income at the date during each of the years here involved that a land installment sales contract was entered into between petitioner and a purchaser of property, which land installment sales contract had not resulted, prior to the end of 1954, in a delivery of a deed to *215 the property to the purchaser, or should no amount be included in petitioner's income from such transaction until such time as a deed was delivered or total payments under the land installment sales contract exceeded petitioner's basis in the property. (c) Should petitioner's basis in property be distributed between that applicable to a retained ground rent and that applicable to the sale of a leasehold where petitioner acquired a leasehold estate for a stated sum, redeemed the ground rent with respect to such leasehold estate, and subsequent to such redemption created a new ground rent and sold a leasehold estate, retaining the fee interest in the property subject to the ground rent so created. (d) To what extent did petitioner understate his income from the sales of properties which he reported on his income tax returns for the years here involved. (e) What is the correct amount of taxable income received by petitioner from sales of real properties, which sales were either omitted by petitioner from his reported income for the years here involved or reported in the wrong year. (f) Since petitioner has agreed that transactions reported on the income tax returns filed in the *216 name of Standard Liquidators, Inc., should properly be included in his taxable income for the years here involved, what is the proper amount so to be included from such transactions, the same circumstances set forth in issues 3(a) through (e) being present in connection with transactions carried out in the name of Standard Liquidators, Inc.
(g) When petitioner executed a deed which he delivered to a purchaser of property who placed a mortgage on the property the proceeds of which were to be paid to petitioner, but petitioner received only a part of the proceeds of the mortgage on such property from the building and loan association lender, the balance of such proceeds being placed in an account in petitioner's name in such building and loan association, which account petitioner hypothecated with such association until a portion of the mortgage had been repaid by the purchaser, what is the fair market value, if any, of such hypothecation to be included as receipts by petitioner from the sale of the property. (4) What amount of interest income did petitioner receive during each of the taxable years here involved with respect to payments on land installment sales contracts which carried *217 a provision for payment of interest on the unpaid balance of the stated purchase price and also provided for the payment of a ground rent to be created and what amount of interest income did petitioner receive on hypothecated savings accounts. (5) What is petitioner's basis in ground rents created prior to 1950 upon petitioner's sale of a leasehold interest to be used in determining petitioner's gain upon sale or redemption of such ground rents in the years 1950 through 1954. (6) What amount of income did petitioner receive from release to him by the building and loan associations of hypothecations which he had purchased from others and hypothecations which had been created at the time petitioner gave a deed to the purchasers from him of properties. (7) Did the amounts petitioner received on release of hypothecations which he had purchased constitute long-term capital gains from the sale or exchange of capital assets. (8) What is the proper amount of deductions to which petitioner is entitled for taxes, insurance, ground rents, depreciation, commissions paid, repairs, and other current expenses in connection with properties held by him during each of the taxable years here *218 involved. (9) Did petitioner have personal deductions in each of the years here involved in excess of the standard deduction. (10) What amount of capital gain did petitioner realize upon sale of his personal residence in 1953. (11) Is petitioner liable for additions to tax for substantial underestimation of estimated tax for each of the years 1951 through 1954. Findings of Fact Some of the facts have been stipulated, and the stipulated facts, including the agreed exhibits attached to the stipulation, are found accordingly. During the taxable years 1950 through 1954 and for many years prior thereto, petitioner was in the real estate business in Baltimore, Maryland, and his income tax returns for all years were filed with the district director of internal revenue for the district of Maryland. A substantial portion of petitioner's business consisted of the purchase and sale of residential properties. Many of the properties which petitioner purchased were in fee simple, and many others were a leasehold estate subject to an annual ground rent which was redeemable at the sole discretion of the owner of the leasehold estate at any time after 5 years from the date of the creation *219 of such ground rent. A very few of the leasehold estates purchased by petitioner were subject to ground rents which were not redeemable. Most of the properties which petitioner purchased were located in neighborhoods in which the majority of the homes were built in the early 1900's. Some of the properties which petitioner bought were in poor condition, and petitioner would make extensive repairs before renting or selling the property. The majority of the homes sold by petitioner during the years here involved were sold to negroes. During the years here involved, and for a number of years prior thereto, substantially all of petitioner's sales of residential property were originated through the execution by petitioner, as seller, and his customer, as buyer, of a contract. Prior to July 1, 1951, when the "Land Installment Contracts Law of Maryland" (Chapter 596 of the Maryland Laws, 1951), Sections 110 through 116 of Article 21, Maryland Annotated Code, became effective, petitioner had a printed form of contract which he generally used in transactions with respect to the sale of residential property. This standard form provided as follows: THIS CONTRACT OF SALE, made this… between. *220 .. as owner, and… WHEREAS, the owner owns leasehold property situate in Baltimore City and known as… which premises is subject to an annual ground rent of… and this day sold said leasehold property unto the buyer at and for the sum of… of which the buyer has this day paid… on account of the purchase price. The balance of the purchase price is to be paid by the buyers in weekly payments of… from which payments the seller shall pay the expenses on the property such as taxes, ground rent, insurance; the buyer is to pay interest on the unpaid purchase price at the rate of 6 per cent per annum and the remaining balance after payment of expenses and interest, to be applied to the principal. The buyer shall finance the remaining balance on the building association eight year plan. As soon as the sum of… is paid to the principal the buyer will have this property financed in a building association, the expense of such financing to be borne by the buyers, at which time Deed will be given same. It is agreed that all payments to be made under this agreement shall be made on each… of every week and that the time is of the essence in making such payments. All expenses such as taxes, *221 ground rent, interest, to be adjusted as of…. The buyer agrees as follows: 1. That they will make weekly payments of… on each… of every week at the office of the owner. First payment due on… 2. That they will maintain the property and keep same in good repair and condition and at failure to maintain and keep said property in good repair and condition shall constitute a default under the terms and conditions hereof and authorize the owner to re-enter and take possession of said premises as hereinafter provided for. 3. That they will maintain no business on said premises nor do anything that would contravene the existing fire insurance policy on the premises. 4. That in the event of a default in any one of the payments agreed to be made hereunder, the said owner upon giving the said buyer a five day notice in writing (said notice to be mailed to the buyers at the above address or delivered in person) shall consider this agreement at end and of no effect either in law or in equity and all payments made by the said buyer shall belong to the said seller, as liquidated damages for the use and occupancy of said premises. 5. That the buyer immediately start to put property *222 in good repair and condition such as papering, painting, doing all necessary carpentry work. And upon breach of any of the conditions and covenants hereof the said owner, may, at its option consider the buyer as tenant from week to week or month to month and the relation between said parties shall not be that of owner and buyer, but as landlord and tenant at the same rental as the above weekly payments, and the said landlord shall be entitled in addition to all other provisions herein contained, to the benefits of all provisions of the law for the speedy recovery of the possession of land and tenements held over by the tenants in the City of Baltimore, as provided by the Code of Public Laws, Article 4, Sections 844-864 both inclusive and Article 53 of the Code of Public Laws of Maryland or to any other and all other provisions of the law now in force or which may become in force including a five day eviction notice and including summary ejectment after said notice, or the said owner, may, at its option make a distraint for the rent due. And upon payment by the said buyers to the said owner of the balance of the purchase price, as hereinabove stated, or by anticipation in payment, *223 the said owner agrees to execute a deed for the property intended to be sold at the buyer's expense by the owner conveying the aforesaid property by a good and marketable title to the buyer, free, clear, and discharged from the payment of all liens and encumbrances. It is further understood and agreed that until default the said owner shall be entitled to possession of said property; all expenses on said property such as taxes, insurance, interest on the balance of the purchase price and any and all other charges or assessments thereon to be adjusted to the day of this agreement. It is further understood and agreed that any waiver of any clause of this agreement by the said owner shall waive the clause only for that particular case and with that one exception the said clause shall remain in full force and effect. This Conditional Contract of Sale shall not be recorded among the Land Records of Baltimore City, and if so recorded, contrary to this provision said recordation shall be null and void and shall in no wise effect title now held by the said owner in and to the aforesaid property. This Agreement is not assignable nor transferrable without the written consent of the owner. *224 As witness the hands and seals of the parties hereto the day and year first above written. After July 1, 1951, when the provisions of Chapter 596 of the Laws of Maryland, 1951, with respect to land installment contracts became effective, petitioner used in all his transactions the standard land installment contract approved by the Real Estate Board of Baltimore. This contract provided as follows: STANDARD LAND INSTALLMENT CONTRACT Approved by Real Estate Board of Baltimore This Agreement of Sale, made this… day of… 195…, between… who resides at… and whose post-office address is… Seller, and… who resides at… and whose post-office address is…, Buyer. Witness that the said Seller does hereby bargain and sell unto the said Buyer, and the latter does hereby purchase from the former the following described property, situate and lying in… at and for the cash price of: $ … Fees and other charges, if any $ … Insurance, covering loss by fire,… in the amount of $ …, payable to Seller and/or Buyer as their interests may appear. Policy expires $
Total Purchase Price $
Paid on account by Buyer $
Principal balance owed by
Buyer $
*225 The above principal balance, together with the following listed property expenses, shall be paid by Buyer to Seller at (Place of payment)… in consecutive (monthly) (weekly) installments of $ … each, which shall severally become due and payable on the… day of each and every (month) (week) beginning with the first installment due on the… day of…, 19…. Interest at… % per annum
on present unpaid balance
of purchase price $
Annual Ground Rent (if any) $
Present Annual Taxes $
Estimated Annual Water Rent $
Insurance Premiums $
Other Public Charges, as
follows: $
Said installment payments shall first be applied by the Seller, as provided in Chapter 596 of the Laws of Maryland, 1951, to the payment of (a) taxes, assessments and other public charges levied or assessed against said property and paid by the Seller; (b) ground rent, if any, paid by the Seller; (c) insurance premiums on said property paid by the Seller; (d) interest on unpaid balance owed by the Buyer; (e) principal balance owed by Buyer. As the principal balance is reduced the amount of interest charged will become less, so that payments on principal will be correspondingly *226 increased. It is understood that taxes, water rent and other public charges may vary from time to time, and that in the event of any increase in such charges, the installment payments shall be increased accordingly, and that in the event of any decrease in such charges the difference shall be credited to the unpaid balance of the purchase price. Seller agrees that Buyer shall have the right to accelerate any or all installment payments. Collateral security (if any) taken for vendee's obligation under this contract: It is understood and agreed that, at any time during the life of this contract, upon thirty days written notice and demand by the Seller, Buyer shall accept a conveyance of the premises, pay the customary transfer charges, and execute a purchase money mortgage or mortgages to the Seller, or to a mortgagee or mortgagees procured by the Seller, in the amount of the unpaid principal balance then owing under this contract, said mortgage or mortgages to contain the provisions and covenants set forth in Section 119(6) of Chapter 596 of the Laws of Maryland, 1951. Payments under such mortgage or mortgages shall not be in excess of the periodic payments required under this *227 contract. When any mortgage or mortgages is executed pursuant to the Seller's demand under this paragraph, Buyer shall be liable for the expenses set forth in said Section 119(6) of said Chapter 596, and the deed and mortgage or mortgages executed pursuant to this paragraph shall entirely supersede this contract. The Seller shall have the right at all times to mortgage the property and to maintain a mortgage or mortgages thereon in accordance with the provisions of Section 119(5A) of Chapter 596 of the Laws of Maryland, 1951. Any such mortgage or mortgages executed under the provisions of this paragraph shall be for such term as may be required to amortize completely said principal sum, together with interest at the rate of… per cent per annum (not more than six per cent per annum), and the expenses as described herein, upon the payment of periodic amounts not greater than those required under this contract. The Buyer agrees: 1. To keep the premises in good order and in as good condition as when received, the natural wear and decay of the property excepted. 2. That he will not assign or transfer this agreement without the written consent of the Seller. 3. That all necessary *228 alterations or repairs shall be made by him at his own expense. 4. That he will make the payments provided hereunder when and as they become due. 5. That he will not do, suffer or permit anything to be done in or about the premises which will contravene the policies of insurance against loss by fire. 6. That he will not use or permit the use of the premises for purposes other than those of a dwelling. 7. That he will not rent the premises in whole or part without first obtaining the written consent of the Seller. 8. That he will comply with all local and other laws and regulations governing occupancy and use of the said premises. Said property has been inspected by Buyer prior to the date of this contract and Buyer accepts it in its present condition. There are no collateral understandings or agreements as to any repairs, alterations, or additions to be now or hereafter made by the Seller. AND upon payment as above provided of the unpaid purchase money, a deed for the property containing covenants of special warranty and further assurance, shall be executed at the Buyer's expense by the Seller, which shall convey the property to the Buyer. Title to be good and merchantable, *229 free of liens and encumbrances except as specified herein and except: Use and occupancy restrictions of public record which are generally applicable to properties in the immediate neighborhood or the sub-division in which the property is located, and publicly recorded easements for public utilities above ground and any other easements which may be observed by an inspection of the property. The herein described property is to be held at the risk of the Seller until legal title has passed or right of possession has been given. Ground rent, rent, water rent, taxes and other public charges against the premises shall be apportioned as of…, at which time right of possession shall be given; and the said parties hereto hereby bind themselves, their heirs, executors and administrators, for the faithful performance of this agreement. It is also understood and agreed that the Seller shall immediately have all of the insurance policies on the property so endorsed as to protect all parties hereto, as their interests may appear, and continue said insurance in force during the life of this Contract, at the expense of the Buyer. DEFAULT: Failure of Buyer to make payments as herein provided *230 or to abide by and perform all the terms, covenants, conditions and obligations of this contract shall constitute a default, and shall, in addition to other remedies provided by law, entitle the Seller to make a sale of the property in accordance with the provisions of Sec. 122 of said Chapter 596, Laws of Maryland, 1951. Said Buyer hereby assents to the passing of a decree by the Circuit Court of Baltimore City or the Circuit Court Number Two of Baltimore City, or by the Circuit Court for the County in which the property is located, for a sale of said property in accordance with the provisions of said Sec. 122 of Chapter 596, Laws of Maryland, 1951. And upon any sale of said property under the powers hereby granted, the proceeds shall be applied as follows, to wit: First, to the payment of all expenses incident to said sale, including a commission to the party making sale of said property equal to the commission usually allowed trustees for making sale of property by virtue of a decree of a Court having equity jurisdiction in the State of Maryland; second, to the extinguishment of all claims of the Seller herein, his, its, or their heirs, executors, administrators, successors, or *231 assigns, whether the same shall have then matured or not, and third, the balance, if any, to the Buyer herein, his or their heirs, executors, administrators, or assigns. This contract contains the final and entire Agreement between the parties hereto, and neither they nor their Agents shall be bound by any terms, conditions or representations not herein written; time being of the essence of this Agreement. Cost of all documentary stamps required by law shall be divided equally between the parties hereto. Witness in duplicate the hands and seals of the parties hereto the day and year first above written. NOTICE TO BUYER You are entitled to a copy of this contract at the time you sign it. (Seal) Witness Seller's Signature (Seal) Witness Seller's Signature Date signed by Seller (Seal) Witness Buyer's Signature (Seal) Witness Buyer's Signature Date signed by Buyer RECEIPT FOR COPY OF THIS CONTRACT The undersigned Buyer hereby acknowledges receipt of copy of the foregoing contract this… day of… 19 . Buyer Witness Buyer Witness In many of the contracts in describing the property the following would be provided: "subject to an annual ground rent *232 of $ … to be created by a lease redeemable 5 years after date of lease at 6% capitalization"; and in the spaces provided for interest and ground rent on the form of contract would be placed a stated amount, the amount placed in the column for interest being 6 percent interest on the unpaid balance owed by the buyer and the amount placed in the ground rent column being the amount of the stated ground rent to be created by a lease. The laws of Maryland provided for the recording of standard land installment contracts and generally such contracts were recorded in the same manner as a deed. However, as a matter of practice, very few of the land installment contracts which petitioner entered into were recorded. These land installment contracts were assignable and sales of such contracts were common. Petitioner, however, never sold any of his land installment contracts. During the years 1950 through 1954 and for prior years, at least as far back as 1943, petitioner had not reported on his income tax return a sale of property upon the exetion of an installment contract of sale of such property. Petitioner kept a property ledger sheet with respect to each particular property and *233 listed on the property ledger sheet the payments made under land installment contracts. This listing was done on one side of the sheet and on the other side of the property ledger sheet space was provided to enter costs and expenses. Petitioner maintained a record of collections which was made daily as money was received, and the collections were generally posted to the property ledger sheets by employees of petitioner. When an amount had been paid by the buyer in accordance with the land installment contract in a sufficient amount that a mortgage would be placed on the property by a building and loan association, which usually would be a period of 3 or 4 years after the installment sales contract was entered into, a closing transaction would be held with respect to the property and the building and loan association would pay over to petitioner the amount of the mortgage placed by the purchaser on the property and petitioner would deliver a deed to the property to the purchaser. However, in numerous instances, the building and loan association would only agree to place the mortgage on the property if petitioner would agree to leave a certain portion of the amount of the mortgage placed *234 on the property in a savings account with the building and loan association which account would be pledged by petitioner as additional security for the mortgage and which amount would not be released to petitioner until an agreed amount had been paid by the purchaser of the property on the mortgage payments. Interest was paid by the building and loan associations on these savings accounts so hypothecated by petitioner (hereinafter referred to for convenience as original hypothecations) and even though petitioner could not withdraw principal from the hypothecated account, he could withdraw the interest at any time after the accrual date of such interest unless the mortgage was in default in which event the interest could not be withdrawn. The total face amounts of original hypothecations left with building and loan associations by petitioner in the years here involved were $18,540, $50,960, $42,695, $68,134, and $9,430 for the years 1950, 1951, 1952, 1953 and 1954, respectively. At the time a deed to the buyer was given by petitioner and the mortgage placed by the building and loan association, petitioner would close out the ledger sheet on the property and would for the first time *235 report any income with respect to the transaction involving the sale of the property, which for convenience we will hereinafter refer to as the time of "a completed transaction." The settlement sheets incident to the closing of completed transactions would account for all collections which had been made and would allocate a portion of such collections to interest, a portion to ground rent, a portion to taxes, and at times a portion to other items which the buyer was charged with at the time of the closing of the transaction. Charged as expenses on these various ledger sheets would be petitioner's office expenses such as rent, telephone, salaries, commissions, postage, printing, and other items of expenses such as taxes, ground rent, repairs with respect to the particular property, and in addition on most of these ledger sheets during the years here involved were recorded personal expense items of petitioner, set forth in more detail hereinafter, which had no relation to the property with respect to which the ledger sheet was maintained. When a transaction was completed the ledger sheet was removed from the alphabetical listing of ledger sheets which was maintained prior to a completed *236 transaction and put in a file usually with the closing sheets and other data with respect to the property and filed under a number. Petitioner's income tax returns for the years prior hereto and for the years here involved were prepared from the ledger sheets of completed transactions. In November 1948 an agent of respondent audited petitioner's income tax returns for the years 1944 through 1947. This agent saw certain of the ledger sheets, disallowed as deductions personal expenses listed thereon, and made certain other changes. Petitioner agreed to these changes and paid the deficiencies determined by the agent. The deficiencies so determined were based on the reporting of income at the time of a completed transaction. For the taxable years here involved petitioner's income tax returns were prepared by a certified public accountant practicing in Baltimore who had not prepared returns for petitioner prior to 1950. Petitioner supplied the certified public accountant with all of the information from which the returns were prepared other than the depreciation deduction. Prior to 1950 petitioner had not reported the profits from any sales of real estate as long-term capital gain but *237 for the years here involved petitioner reported all of his profits from real estate sales as long-term capital gain. During the years 1950 through 1954, petitioner entered into contracts of the type heretofore set forth with respect to the sale of property in connection with 265 various pieces of property. The name of the property, the name of the purchaser, the amount of down payment, and the date on which the contract was entered into are set forth as items one through 265 on a stipulated exhibit which has been incorporated herein by reference. During the years 1950 through 1954 petitioner failed to report on his income tax returns any profit with respect to 16 completed transactions and reported 6 such transactions in the wrong year. In addition to sales made by petitioner in his own name during the years 1950 and 1951 certain transactions were negotiated in the name of Standard Liquidators, Inc., a corporation which was organized by petitioner solely for his convenience. Standard Liquidators, Inc., filed income tax returns for 1950 and 1951 reporting and paying income taxes in the amounts of $3,157.53 and $6,397.45, respectively, for those years. The parties agree that the *238 transactions reported by Standard Liquidators, Inc., were properly accountable by petitioner. On the return of Standard Liquidators, Inc., 22 sales of property were reported in 1950 and 21 such sales in 1951. The details with respect to the name of the properties, the cost and gain as reported, and the name in which the title to the property was recorded on the land records of the city of Baltimore are set forth in a stipulated exhibit which has been incorporated herein by reference. During the years 1950 through 1954 and for years prior thereto, petitioner purchased numerous savings accounts hypothecated with various building and loan associations which had arisen through transactions by others similar to petitioner's transactions in which his original hypothecations arose. During some or all of the years 1950 through 1954 petitioner owned 120 such purchased hypothecations which he had acquired over a period from December 13, 1944, to November 10, 1954. The location of the property, the name of the building and loan association with which the account was pledged, the face amount of the account hypothecated, the cost to petitioner of the hypothecation, the date the account was *239 originated, and the date acquired by petitioner are set forth with respect to 119 of these 120 accounts in a stipulated exhibit which has been incorporated herein by reference. These hypothecations will hereinafter be referred to for convenience as purchased hypothecations. Petitioner in purchasing hypothecations gave consideration both to the value of the property on which the mortgage for which the hypothecation was additional security was placed and to the credit standing of the mortgagor. He was selective in his purchases. The total cost to petitioner of purchased hypothecations which were held by him during the years involved was $79,374.78, and the face value of such hypothecations was $208,800. In some instances when the home owner failed to meet the mortgage payments on a mortgage with respect to which petitioner had purchased a hypothecation, petitioner would, upon notification by the lending institution of the commencement of foreclosure proceedings, pay the mortgage balance in full in order to protect his investment in the hypothecation. Upon petitioner's purchase of the mortgage by payment of the balance in full, the lending institution would release to petitioner the *240 hypothecation which it had with respect to the property. At some time during the years 1950 through 1954 petitioner owned original hypothecations, some of which had been originated as early as 1944 and some of which were released during the years 1950 through 1954, and some of which were originated as late as 1954, which are set forth in detail as to the location of the property, date originated, face amount of the hypothecation, and date released in a stipulated exhibit which has been incorporated herein by reference, except that the exhibit contains one item listed as item 143, "307 North Fulton Ave.," which is incorrectly shown. A typical hypothecation agreement provided as follows: NOW, THEREFORE, This agreement and Guaranty, Witnesseth, That in consideration of the premises and the sum of one dollar, the said Pledgor… do hereby pledge and hypothecate to said Pledgee said shares of stock of said Pledgee as shown on the pass book issued by said Pledgee and now numbered… (issued in the name of said Pledgor) as guaranty for said loan to said Mortgagor…, to the extent of the sum of… Dollars until the sum of…. Dollars shall have been paid thereon and the original principal *241 of said loan reduced thereby to that extent, with no default in any of the provisions of said Mortgage in the meantime and over and above all accrued expenses on said property and interest and fines, if any, due on said mortgage debt. IT IS FURTHER AGREED, That should there be default in any of the conditions or covenants of said Mortgage and the said Mortgage be foreclosed and the mortgaged premises or property sold for a sum less than sufficient to net said Pledgee the amount of its claim less additional advances to principal, if any, under said Mortgage so foreclosed, then said Pledgee shall have full power and is hereby authorized and empowered to take and appropriate from the amount to the credit of said Pledgor… on said pass book without further notice of said Pledgor…, an amount sufficient to make good any deficiency under said foreclosure up to the amount of… Dollars and to deduct said amount from said pass book and from the account of said Pledgor… on the books of said Pledgee the same as if withdrawn at the request of said Pledgor…. Generally the account with the building and loan association which was hypothecated could be assigned by the owner and these hypothecations *242 were bought and sold not only by petitioner but by others, and actually during some of the years here involved were advertised for sale in various newspapers in Baltimore. Petitioner never sold any of his original hypothecations. On petitioner's income tax returns for the years 1950 through 1954 petitioner did not report as a part of the selling price of properties which he reported as sold upon the occurrence of completed transactions any portion of the hypothecated savings accounts, and never reported on any of his returns from 1950 through 1954 any income under a heading of "hypothecations." On the 1950 and 1951 returns of Standard Liquidators, Inc., and the 1950 and 1951 income tax returns of petitioner certain income was reported under the designation, "Second mortgages" which in reality represented income upon the release of purchased hypothecations. With only two exceptions which involve insignificant amounts, petitioner did not report either on any of his individual returns for the years 1950 through 1954 or on the returns of Standard Liquidators, Inc. for the years 1950 and 1951 any income with respect to original hypothecations. On the property known as 307 North Fulton *243 Avenue, petitioner in 1947 purchased a hypothecation for $500, the hypothecation having a face value of $1,000. Petitioner never reported any income from this hypothecation. In 1952 the building and loan association released its lien upon the amount and petitioner received $1,000 from the release of this hypothecation. During the years 1950 through 1954 and prior thereto petitioner purchased numerous ground rents and also sold both ground rents which he had purchased and ground rents which he had created at the time of sale of a leasehold interest in property which he owned in fee. During the years 1951 through 1954 petitioner sold a total of 95 ground rents, some of which had been purchased and some created by him. In the years 1950, 1951, 1952, 1953, and 1954, petitioner had income from ground rents paid to him in the amounts of $4,407.98, $6,070.19, $5,626.91, $4,391.68, and $3,774.03, respectively not including any amounts which petitioner might have received under land installment contracts designated as ground rents with respect to ground rents to be created. Some of petitioner's properties were at certain times rented. One of the stipulated exhibits lists properties which *244 the parties agree were rented during the years 1950 to 1954 and agree with respect to the gross rentals received from such properties. During the year 1950, four such properties were rented at a gross rental of $2,858.50; during the year 1951, five such properties were rented at a gross rental of $2,939.95; during the year 1952, five such properties were rented at a gross rental of $3,793.90; during the year 1953, thirteen such properties were rented at a gross rental of $3,818.05; and during the year 1954 thirty-seven such properties were rented at a gross rental of $15,357.90. The stipulated exhibits which have been incorporated in these findings by reference show as to the properties which were rented by petitioner during the years 1950 through 1954, the date they were acquired. During the years 1950 through 1954 petitioner owned certain properties with another as a joint venture and the parties have stipulated a schedule showing a listing of these properties in each of the years 1950 through 1954 and the gross income from the rental of such properties, as well as certain properties owned as a joint venture by petitioner which were sold during the years 1951 through 1954. Among *245 the properties which petitioner sold during the taxable years here involved and reported no gain or loss therefrom on his income tax returns was a church property sold by petitioner in 1951. This property was located at 1204-1206 Eutaw Place in Baltimore and was purchased by petitioner in 1948 for $30,000 plus $250 paid for a title search of the property. In 1951 petitioner sold the property for a stated amount of $62,500, which amount was paid to petitioner by a cash payment of $20,000 and a mortgage given to petitioner in the amount of $42,500 payable at the rate of $300 per month with interest at 5 percent. The organization purchasing the church was a newly formed congregation in Baltimore. This congregation had rented the church for a short time prior to purchasing it. The fair market value of this mortgage at the date of the sale of the property was $29,000. In 1950 petitioner purchased at an auction a property located at 1001-1009 Warner Street in Baltimore for a total price of $12,050. Shortly after purchasing this property petitioner assigned his interest therein to a syndicate for $12,350 thus realizing a gain of $300 on this property in 1950. Petitioner did not sell during *246 any of the years here involved a property known as 1733 South Hanover Street in Baltimore, Maryland. In 1945 petitioner acquired from the Alien Property Custodian 30 acres of property with 15 houses thereon located at Price's Cove, Maryland at a cost of $13,150. These properties had not been used for a number of years. After petitioner acquired these properties, he engaged a number of workmen to repair the properties and repairs were made to the properties over a period of several months. The repairs consisted of replacing the plumbing and electrical installations, replacing roofing, cement work, papering, glazing, plastering, repairs to and replacements of floor, and general carpentry. The total cost of the repairs made by petitioner to these properties was $5,000. Petitioner sold these properties as 15 separate parcels during the years 1950, 1952, and 1953. Petitioner's bases in these properties for apportionment among the various properties in the manner shown on a stipulated exhibit is $18,150. In 1953 petitioner sold his personal residence located on Barrington Road in Baltimore, Maryland. The original cost of this property was $7,250. After acquiring the property petitioner *247 made certain improvements thereto including converting it into two apartments, one of which he rented. The total cost of such improvements was $2,845. During each of the years 1950 through 1954 petitioner charged as costs on the property ledger sheets of various properties numerous items of personal expenses. In most instances these items were actually entered on the ledger sheets by employees of petitioner at petitioner's specific direction that they be so entered. In some instances petitioner himself made the entries. The amounts of the items so entered and the fact that they were personal items and in no way related to petitioner's business have been stipulated by the parties, and an exhibit which is attached to the stipulation and incorporated herein by reference shows the various items. The items which were so charged as expenses of the various properties on petitioner's ledger sheets included hotel bills for petitioner and guests who were in no way related to petitioner's business, restaurant bills, nightclub bills for food and entertainment which were unrelated to petitioner's business, department store bills for purchases made by petitioner for personal items for his mother *248 and daughter, as well as personal items for himself, and items of furniture for an apartment occupied by petitioner's sister-in-law who at the time was caring for petitioner's minor daughter. Also charged against the accounts were amounts given by petitioner to his mother and daughter for their personal use, bills for gas, electricity and telephone at petitioner's personal residence, and bills for petitioner's medical expenses and life insurance premiums on his life, wedding gifts made to certain relatives of petitioner, cleaning bills, payment for vacation trips of petitioner's sister and daughter, and payments to a handicapper for the placing of bets on horse races, and a number of similar items totally unrelated to petitioner's business. Petitioner did not maintain adequate books and records during the years 1950 through 1954. The only books maintained by petitioner of which any of the employees in his office made regular use were the ledger sheets with respect to properties which had not resulted in completed transactions. Other than the amounts of collections from purchasers posted to these sheets all of the items posted were in accordance with petitioner's directions to his *249 office employees. Petitioner kept an index book which indexed the numbers to the ledger sheets of properties which had resulted in completed transactions. Petitioner generally kept this index book in his private office. The property ledger sheets did not reflect repossessions of properties, ground rent redemptions, ground rent creations, ground rent sales, mortgages assumed, purchased mortgages taken, or hypothecations. Petitioner personally kept a book with respect to hypothecations. He personally retained complete control of this book and except in a few instances, made all of the postings therein. Most of his office employees had never seen this book and did not know of its existence. Petitioner also maintained personally a separate ground rent book during the years 1950 through 1954. In June 1955, Internal Revenue Agent Francis C. Davis contacted petitioner with respect to an investigation of his income tax returns for the years 1950 through 1954. Revenue Agent Davis was handed certain property ledger sheets selected by petitioner which related to certain real estate transactions reported on petitioner's income tax returns for the years 1950 through 1954. Revenue Agent Davis *250 was furnished with the index book maintained by petitioner, and in checking this index book with property ledger sheets, he came to the conclusion that petitioner's income tax returns were incorrect and did not reflect all of petitioner's property transactions. About the first of August 1955 Special Agent John C. Neely was placed in charge of the investigation of petitioner's returns for the years 1950 through 1954, and Revenue Agent Davis worked in assisting Special Agent Neely. Special Agent Neely contacted petitioner on August 12, 1955, and upon being questioned with respect to any records of hypothecations, petitioner stated that he did not keep any record of hypothecations and that if he made any money on hypothecations it went on the ledger sheets and was entered on such ledger sheets by the girl in the office. Petitioner denied that he had any additional records of hypothecations. Special Agent Neely subsequently made further requests for additional records, particularly with respect to hypothecations, and at petitioner's suggestion prepared a letter listing the items requested and sent it to petitioner. Neither Special Agent Neely nor Revenue Agent Davis throughout the *251 entire investigation ever received any records of petitioner, except some of the property ledger sheets and property ledger folders including ledger sheets, settlement sheets, contracts, and similar papers relating to a specific property, certain building and loan books showing savings accounts sometimes referred to as free-share books, and certain collection sheets. Special Agent Neely and Revenue Agent Davis proceeded with their investigations of petitioner's tax liability for the years 1950 through 1954 from third party sources, such as land records of the city of Baltimore and surrounding county records building and loan association records, department store records and records which they obtained from various individuals. After the investigation of petitioner's returns for the years 1950 through 1954 had begun, the index book became unavailable, petitioner stating that it had been lost or destroyed and so did the ledger sheets relating to Standard Liquidators, Inc.'s transactions and older ledger sheets from which entries were stated to have been transcribed onto newer sheets. After Revenue Agent Davis and Special Agent Neely had begun their investigation of petitioner's tax *252 returns for the years 1950 through 1954, petitioner made alterations in and additional entries on property ledger sheets relating to transactions which had occurred during the years 1950 through 1954 and obliterated certain figures and descriptive words on the ledger sheets in connection with items of personal expenses charged on such ledger sheets. The property ledger sheet with respect to the sale of petitioner's personal residence, the gain from which was not reported by petitioner on his 1953 income tax return, if one had existed, was either lost or destroyed and was unavailable for use by the examining agents. On February 26, 1958, there was filed in the United States District Court for the District of Maryland an indictment containing four counts, each count charging that petitioner did willfully attempt to evade or defeat a large part of the Federal income tax due and owing by him to the United States of America by filing a false and fraudulent income tax return for each of the calendar years 1951 to 1954, inclusive, in violation of the provisions of section 7201 of the Internal Revenue Code of 1954. Petitioner entered a plea of "Not Guilty" to each *253 count of the indictment and after a trial by jury was found guilty as to each count in the indictment. Petitioner on his income tax return for the year 1950 reported net income of $21,573.86. Respondent determined that petitioner had additional income and unallowable deductions in the year 1950 as follows: Income from interest
$ 9,352.27
Gains from sales of property
146,795.56
Income from collection of hypothe-
cations
41,565.00
Income from rents
1,078.93
Income from joint ventures
1,066.13
Miscellaneous business expenses
3,370.38
Itemized nonbusiness deductions
1,314.41
On his income tax return for the year 1951 petitioner reported net income in the amount of $40,809. Respondent determined that petitioner had additional income and unallowable deductions in the year 1951 as follows: Income from interest
$ 21,893.41
Gains from sales of property
334,490.87
Income from collection of hypothe-
cations
56,140.50
Income from rents
1,078.88
Miscellaneous business expenses
3,700.16
Contributions
371.00
On his income tax return for the year 1952 petitioner reported net income in the amount of $17,216.77. Respondent determined that *254 petitioner had additional income and unallowable deductions in the year 1952 as follows: Income from interest
$ 54,754.82
Gains from sales of property
256,893.17
Income from collection of hypothe-
cations
43,758.00
Income from rents
2,968.77
Miscellaneous business expenses
2,604.81
Itemized nonbusiness deductions
170.19
On his income tax return for the year 1953 petitioner reported net income in the amount of $25,621.60. Respondent determined that petitioner had additional income and unallowable deductions in the year 1953 as follows: Income from interest
$ 94,314.19
Gain from sales of property
311,279.40
Income from collection of hypothe-
cations
40,038.00
Income from rents
1,102.82
Business expenses
4,014.72
Itemized nonbusiness deductions
445.89
Unreported capital gain from sale of
personal residence
5,111.06
On his income tax return for the year 1954 petitioner reported net income in the amount of $15,798.15. Respondent determined that petitioner had additional income and unallowable deductions in the year 1954 as follows: Income from interest
$122,891.08
Gains from sales of property
154,420.91
Income from collection of hypothe-
cations
32,604.94
Income from rents
4,165.43
Business expenses
2,408.61
Standard deduction
500.00
*255 Respondent's explanation of these various items was to the general effect that the items were unreported or understated and that respondent's computation was shown on attached exhibits. The attached exhibits showed the computation of petitioner's income from the sale of properties by considering all land installment sales contracts which were entered into by petitioner during the years 1950 through 1954 and which had not become a completed transaction during those years by the delivery of a deed and the purchaser's placing a mortgage on the property with a building and loan association, to constitute completed sales at the date of entry into the land installment contract. In this computation the sales price of the property was the face amount shown on the land installment contract. In the case of any transaction which became a completed transaction by the delivery of a deed to the purchaser and receipt by petitioner of proceeds of the mortgage placed by the purchaser with the building and loan association, whether a land installment contract with respect to such property had previously been entered into by petitioner and the buyer either during the years 1950 through 1954 or prior *256 thereto, respondent considered the property as having been sold at the date of the completed transaction and considered the amount received from the sale to be the amount shown as previously paid through the land installment contract to petitioner, plus the proceeds received by petitioner from the lending association on the mortgage, plus 50 percent of any amount hypothecated with such lending association by petitioner, plus in most instances a value assigned to ground rents created at the time of the sale capitalized at 6 percent. In some instances the amount of the proceeds from installment payments under the land installment sales contract included amounts allocated to interest and ground rents at the time of the closing. In thus computing income from the sales of property respondent increased the amount received from sales which had been reported by petitioner on his income tax returns for the years 1950 through 1954 and also increased petitioner's reported income by including therein gains on sales which had not been reported by petitioner. In determining the net proceeds from the payments under the land installment contracts from the date of inception of the contract up to *257 the time the contract became a completed transaction with the delivery of deed and placing of a mortgage by the purchaser on the property, respondent eliminated from expenses charged by petitioner to the property on the ledger sheets personal items charged to the property. Respondent used as the basis of the property, the cost of the property to petitioner plus such expense items as he recognized to be proper. Where the original property had been a leasehold purchase and petitioner had subsequently redeemed a ground rent, the cost of the redemption of the ground rent was included in basis. This had the effect of using as a basis of the property, the cost of the property in fee simple to petitioner, although in most instances the sale was of a leasehold estate, petitioner retaining the fee and providing for the payment by the purchaser of a ground rent. Respondent computed in the same manner the profit to petitioner on sales made under the name of Standard Liquidators, Inc.
In computing petitioner's income from interest respondent allocated a portion of the payments in each year on land installment contracts to interest computed on the principal balance of the purchase price at *258 the date the contract was entered into, and also included as a part of the interest the amount of the ground rent payment provided for in the contract with respect to ground rents to be created as well as payments with respect to ground rents already existing with respect to the properties. Respondent also included the interest credited by the building and loan associations in each of the years to petitioner's hypothecated savings accounts, both with respect to purchased hypothecations and original hypothecations. In computing petitioner's income from collections on hypothecations in each of the years respondent used as a basis of the purchased hypothecations, the cost of such hypothecations to petitioner and prorated any amount released to petitioner between return of basis and profit on the basis that the total cost of the hypothecation bore to the face amount of such hypothecation. Where the entire amount of the hypothecation had been released because of petitioner's purchasing the mortgage from the lending institution respondent included the entire face amount of the hypothecation in excess of its cost to petitioner in petitioner's income from payments on hypothecations and considered *259 petitioner's basis in the mortgage which he purchased to be the amount petitioner paid therefor. In determining petitioner's income from payments on original hypothecations, respondent considered the total payments to be income where payments were with respect to hypothecations originated in transactions closed during years prior to 1950. Respondent's computation of unreported rents received by petitioner was for amounts received from rental properties less expenses as computed by respondent with respect to such rental properties and depreciation thereon. In computing the income from rents respondent generally computed depreciation on the property on the basis of a useful life of 25 years although with respect to certain properties respondent used a useful life of 33 1/3 years and with respect to other properties a useful life of 10 years. Included in respondent's computation of gain on the sale of properties in each of the years 1951 through 1954 was an amount for gains from the sale of ground rents in the amount of $30,624 for 1951, $12,252.53 for 1952, $6,520.53 for 1953, and $318.29 for 1954 with no amount shown as having been reported by petitioner on his income tax returns. *260 The disallowance of miscellaneous business expenses and itemized nonbusiness deductions was for failure to show that the amounts disallowed were paid during the taxable year and that the items claimed were for allowable deductions. In the year 1953 respondent included the gain by petitioner on the sale of his personal residence in petitioner's income as a capital gain. Respondent determined that a part of the deficiency determined by him for each of the years involved was due to fraud, and therefore determined a 50 percent addition to the tax in each of the years. Respondent for the years 1951 through 1954, determined an addition to tax for substantial underestimation of estimated tax. Opinion The stipulated facts show that the assessment of a deficiency in petitioner's income tax for each of the years 1950, 1951, and 1952 is barred by the statute of limitations unless the return is false or fraudulent with intent to evade tax, so that the tax may be assessed at any time under the provisions of section 276(a) of the Internal Revenue Code of 1939 and section 6501(c)(1) of the Internal Revenue Code of 1954. For the years 1953 and 1954 assessment of *261 deficiencies is barred in the absence of fraud or an omission from gross income of an amount in excess of 25 percent of the gross income shown on petitioner's return. The evidence in this case is clear and convincing that petitioner filed false and fraudulent returns with intent to evade income tax for each of the years 1950, 1951, 1952, 1953, and 1954, and that a part of the deficiency in each of these years is due to fraud. The evidence shows that petitioner in computing his gain from the sales of properties in each of the years here involved deducted as business expenses purely personal items of expenses even though upon audit of his returns for prior years similar personal expenses had been disallowed as deductions. The evidence also shows that petitioner did not report all sales of property, reported no income from the sale of his personal residence, reported no income either at the time of origination or the time of release of original hypothecations, with two very minor exceptions, and reported no income at any time from collections of purchased hypothecations. The evidence also shows that petitioner concealed records from the revenue agents investigating his income tax liability *262 for the years 1950 through 1954 and that he altered records during the course of such investigation. The evidence further shows that for the years 1951, 1952, 1953, and 1954 petitioner was indicted for evasion of income tax and after a jury trial was found guilty. The evidence of fraud here is so clear and convincing that any lengthy discussion of this aspect of the case is unwarranted. In fact, in petitioner's brief the only argument made with respect to the additions to tax because of fraud is that the amount of such addition determined by respondent is excessive because the amounts of the deficiencies determined by respondent are overstated. Petitioner stated in his brief. As is apparent from the stipulation of facts, * * * and the conviction in the District Court case * * * petitioner is in a "nolo contendere" position with regard to the imposition of penalties under section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954. We, therefore, sustain respondent in his determination that a part of the deficiencies in each of the years here involved is due to fraud and that in each of these years petitioner *263 filed a false and fraudulent income tax return with intent to evade tax so that the assessment and collection of deficiencies in each of these years is not barred by the statute of limitations. The real dispute between the parties is with respect to the proper amount of the deficiencies. Some of the adjustments which respondent made are agreed to by petitioner. Petitioner argues that no presumption of correctness whatsoever should attach to respondent's determination because it is arbitrary. Petitioner points out that in certain respects respondent's determination of the year in which income is taxable is inconsistent, and certain items were not handled in accordance with our holding in Welsh Homes, Inc., 32 T.C. 239 (1959), affd. 279 F. 2d 391 (C.A. 4, 1960). Petitioner contends that respondent has been arbitrary in considering a portion of each collection by him by way of release by a building and loan association of amounts hypothecated with such lending agency to further secure the mortgage on properties he had sold to be a return of capital and the remaining portion to be income. In this respect petitioner takes the position that since the Government *264 in its prosecution of the criminal case against petitioner contended that income was received upon collection of any hypothecation only when the total collections thereon exceeded petitioner's basis therein, to use a different method in the determination of the deficiency is arbitrary. Under the circumstances here present, we do not consider respondent's determination to be arbitrary. Respondent had no access to many of petitioner's records and those records to which he did have access were inadequate in many instances so that respondent was forced to resort to third-party records to determine petitioner's income. The testimony of the revenue agent and the special agent indicated that with the available information that they could obtain they attempted to come to a reasonable determination of the proper amount of petitioner's income based on such records and applied principles in so doing that they considered at the time proper under the circumstances. Respondent's determination was based on the report of these agents. This is a very different situation from one in which respondent's determination is arrived at without a considered basis therefor. Although we do not consider respondent's *265 determination arbitrary, as appears throughout this opinion, in many instances we consider it incorrect. Respondent is not estopped from using a different method to compute income from purchased and original hypothecations in the instant case from the method used in the criminal case and we do not understand petitioner to so contend. The question to be decided in the instant case is the proper method for determining the income from such collections. One of the main points in respondent's argument is that because of the difficulty his agents encountered in making their investigation of petitioner's tax liability and because of his proof that petitioner's returns were false and fraudulent, everything determined in his notice of deficiency should be sustained. We do not agree with this contention of respondent. The creditable evidence now before this Court is sufficient with respect to most transactions to make a more proper determination of petitioner's tax liability than the determination made by respondent and the difficulties encountered by respondent's agents in making their investigation do not justify a determination of petitioner's tax liability in excess of the proper amount *266 thereof except in the few instances where we find it necessary to sustain respondent's determination for failure of proof on the part of petitioner. The first item of respondent's computation on which the parties disagree is the amount of petitioner's income from the sale of properties during each of the taxable years here involved. Petitioner takes the position that respondent has been inconsistent in his determination of petitioner's income from the sale of properties. Petitioner states that by computing the income on completed transactions in all cases where such a transaction occurred during one of the taxable years here involved but considering the execution by petitioner and the purchaser of a land installment contract to constitute a sale of the property in all instances where a completed transaction did not occur prior to the end of 1954, respondent has tended to bunch petitioner's income improperly into the taxable years here involved where there is an addition to the tax for fraud. We agree with petitioner that respondent's position in this respect is inconsistent. Respondent attempts to justify his position to a large extent by saying that insofar as those transactions *267 reported by petitioner are concerned he merely accepted petitioner's method of reporting and that as to those transactions and some of the unreported transactions the evidence is not clear whether a land installment contract was ever entered into prior to the settlement whereby the purchaser obtained the deed. We do not agree with respondent. The evidence indicates that petitioner's normal procedure was to sell properties on land installment contracts. It appears that the church property on Eutaw Avenue in Baltimore, petitioner's personal residence, and the properties sold from Price's Cove were not sold on this basis and there is no evidence that the other unreported completed transactions in the years here involved were so sold, but with these exceptions the evidence is that generally the other properties were originally sold under land installment contracts. Some of these contracts had defaulted and petitioner had repossessed the property and resold it. However, the evidence, which to a large extent in this respect is stipulated, shows with respect to most of the properties which had been repossessed this fact also. We hold that respondent is in error in determining when a taxable *268 transaction has occurred on the basis of whether the completed transaction occurred during the years 1950 through 1954 or thereafter. This determination should be made on the basis of when a sale of the property occurred whereby petitioner received cash and other property with an ascertainable fair market value so that gain or loss was properly ascertainable. The record shows that when petitioner entered into a land installment sales contract, such contract was generally the only property he received other than a small cash payment. It is therefore necessary that we determine whether these contracts were "property other than money" with an ascertainable fair market value. Since there are substantial differences in the form of contract used by petitioner prior to July 1, 1951, and the form used thereafter, we will consider the two separately. After considering the type of land installment sales contracts used by petitioner prior to July 1, 1951, we have concluded that these contracts did not have an ascertainable fair market value so as to be included as other property received by petitioner in determining gain or loss on the sale of property. Estate of Coid Hurlburt, 25 T.C. 1286 (1956), *269 and Curtis R. Andrews, 23 T.C. 1026, 1034, (1955). Cf. Phillips v. Frank, 295 F. 2d 629 (C.A. 9, 1961). In the Hurlburt case the sale was consummated by a document entitled, "Receipt and Option" which we referred to as a contract of sale. We concluded that since the contract there involved did nothing more than evidence the amount due the vendor over a period of years and could be regarded as little more than an accounts receivable, the vendor did not receive, on the execution of this contract, any such evidence of indebtedness as would have a fair market value to be considered by a cash basis taxpayer as property other than money received at the time of the sale. In our view the same is true with respect to the contracts entered into by petitioner under the form which the evidence shows was used by petitioner prior to July 1, 1951. This contract which we have set forth in full in our findings plainly provided: That in the event of a default in any one of the payments agreed to be made hereunder, the said owner upon giving the said buyer a five day notice in writing * * * shall consider this agreement at end and of no effect either in law or in equity *270 and all payments made by the said buyer shall belong to the said seller, as liquidated damages for the use and occupancy of said premises. This provision was substantially the same as the provision of a contract considered by the Court of Appeals of Maryland in Schapiro v. Jefferson, 100 A. 2d 794 (Md. 1953). The Court there held that the damages for breach of the contract for nonpayment were specified in the contract and therefore the seller was not entitled to a deficiency judgment in personam against the purchaser. In so holding the Court pointed out that the Land Installment Contracts Act enacted by the Maryland Legislature in 1951 did not take effect until July 1, 1951, and that although that Act [1] contained a provision that a remedy in the nature of a foreclosure of a mortgage "shall be the sole remedy of the vendor for repossession of property sold under a land installment contract executed after July 1, 1951, and that as to such contracts executed prior to July 1, 1951, the foregoing remedy shall also be available in lieu of any summary remedies provided by law for landlord and tenant cases, which summary remedies are hereby made inapplicable to actions arising *271 out of such contracts" that it did not apply to a land installment contract entered into prior to July 1, 1951, where such contract contained its own provisions for the damages to which the vendor was entitled upon default. Under Maryland law, contracts of the type that petitioner entered into prior to July 1, 1951, would not give rights of foreclosure and obtaining of a deficiency judgment in personam against the buyer. Such contracts did not require further payment in the event the purchaser chose to default and lose all previous payments. Such contracts were not other property with an ascertainable fair market value. We, therefore, conclude that here, as in Estate of Coid Hurlburt, supra, these contracts did nothing more than evidence the amounts due to the vendor over a period of years until such time as a stated sum had been paid and the buyer became entitled to a deed to the property. We hold that on any land installment contracts entered into prior to July 1, 1951, the stated amount of the contractual obligation was not an amount realized in the year in which the contract was entered into and that petitioner realized no gain from entering into these contracts until *272 such time as the total payments under the contracts plus the initial payment exceeded his basis in the property or the contract terminated by a closing with petitioner delivering a deed and receiving further payments on the property either in the form of cash, mortgages, or hypothecated savings account. With respect to any sales that became completed transactions during the years 1950 through 1954 which had originated in land installment contracts entered into prior to July 1, 1951, respondent is correct in computing the gain from the sales of such properties as of the date of the closing and is incorrect in computing gain at the time the land installment contract was entered into or until the total payments under such land installment contract exceeded petitioner's basis in the property. We conclude that a different situation exists with respect to land installment contracts entered into by petitioner on and after July 1, 1951. We have also set forth in full in our findings the provisions of these land installment contracts. The provision of Maryland law with respect to these contracts was very precise and gave *273 to these contracts a status closely comparable to that of a mortgage. In fact the provisions of article 21, section 115 of the Maryland Code provide that: Upon default and after notice to the vendee as aforesaid, the vendor, his personal representatives or assigns, after filing an affidavit that the provisions of section 113 of this article have been complied with, may make a sale of the property described in the land installment contract, upon giving bond and complying with the provisions of section 5(b), (c) and (d) of Article 66 or, if in any such land installment contract the vendee shall declare his assent to the sale of the property involved, by applying to the proper court of equity for a decree authorizing the sale of said property upon such terms as said court may deem proper and by complying with the provisions of section 6 of Article 66 as aforesaid; * * * This section goes on to state: * * * it being the intent of this section that the sale of the premises as herein provided shall be made in the same manner as if such land installment contract were a mortgage and the vendor *274 and vendee a mortgagee and mortgagor, respectively; * * * and further provides: * * * the foregoing remedy shall be the sole remedy of the vendor for repossession of property sold under a land installment contract executed after June 1, 1951. * * * The sections referred to in article 21, section 115, with respect to land installment contracts are the sections of the Maryland Code dealing with foreclosure of mortgages. One of the witnesses in this case who was president of a title and guaranty company whose business was to insure titles to real estate testified that under Maryland law the standard land installment contract should have been recorded and that sale by owners of this type of land installment contracts "is done right along." He testified that land installment contracts are usually entered into because the purchaser does not have a sufficient amount of down payment to obtain a mortgage on the property through a building or loan association or similar lending institution and that some owners will enter into land installment contracts and then sell such land installment contracts. It is clear from the standard land installment contract which petitioner used with respect *275 to all land installment contract sales after July 1, 1951, that the contract itself contains an unconditional promise to pay by the buyer, is salable, and is enforceable in the same manner as a mortgage. Under these circumstances we conclude that these land installment contracts are other property which has a fair market value and therefore is includable to the extent of its fair market value in computing the amount received by petitioner upon the sale of property at the time such land installment contract is entered into. Cf. Title & Trust Co., 33 B.T.A. 25 (1935), and Howard H. Perelman, 41 T.C. 234 (1963). Petitioner does not precisely argue that a sale of the property is not made at the time a standard land installment contract of the type used from July 1, 1951, is entered into, but since some of his argument in distinguishing cases involving taxpayers who report their income on an accrual basis from taxpayers who report on the cash basis suggests such an idea, we consider this as the equivalent of such an argument. The law is clear that where a contract of sale is made and the purchaser enters into possession of property, a completed transaction *276 has occurred which constitutes the sale of the property for the incidence of taxation. Ted F. Merrill, 40 T.C. 66 (1963), on appeal (C.A. 9, Oct. 21, 1963); North Carolina Lumber Co., 19 T.C. 587, 599 (1952), reversed on other issues 211 F. 2d 543 (C.A. 4, 1954); and Wiseman v. Scruggs, 281 F. 2d 900 (C.A. 10, 1960). Cf. Nina J. Ennis, 17 T.C. 465 (1951); and Estate of Clarence W. Ennis, 23 T.C. 799 (1955). We recognize that in many of the cases dealing with when a sale is a completed transaction so that taxable gain or loss will result, the taxpayers involved are on an accrual basis of accounting, and no question of the receipt of payment arises as it does in the case of a cash basis taxpayer. It is, however, clear that where a cash basis taxpayer enters into a completed transaction in selling property, his gain on the transaction is the amount by which the money plus the fair market value of property other than money which he receives exceeds his basis in the property. There is no evidence in the record to support petitioner's contention that the standard land installment contract had no fair *277 market value. In fact, even petitioner's argument in this respect confuses the question of the determination of the fair market value with the question of whether the contract is property with a fair market value. One of the witnesses not in the employ either of petitioner or respondent who testified in this case respecting the value of land installment contracts stated in effect that sales under land installment contracts were customary and that the valuation of such contracts would be affected by the value of the underlying properties securing the contracts, the credit standing of the purchaser of the property, and the total amount of payment which had been made with respect to the property at the date of valuation of the contract. An employee of petitioner who handled many of petitioner's sales under land installment contracts and represented petitioner in many instances at property closings stated that a standard land installment contract would have a value equal to the price at which the underlying property could be sold to a property dealer, which he estimated would be generally in the case of the standard land installment contracts here involved equivalent to petitioner's basis *278 in the property. This witness displayed a noticeable bias toward petitioner and we place little weight on his testimony. However, even this witness admitted that these contracts had a fair market value and that such fair market value was ascertainable. Cf. Anderson v. Commissioner, 250 F. 2d 242 (C.A. 5, 1957), affirming in part a Memorandum Opinion of this Court. In Howard H. Perelman, supra, we stated at p. 242: The uncontradicted testimony of petitioners' expert witness, which we accept, was that the land contracts from the 1951 and 1952 sales had a fair market value equal to their face amount in the respective years in which they were received. [footnote omitted]. Therefore, the income from the sales in 1951 and 1952 should have been reported in those years rather than in 1957 and 1958. John W. Commons, 20 T.C. 900 (1953); secs. 111 and 112, 1939 Code, supra. * * * It is respondent's contention in the instant case that the land installment contracts here involved had a fair market value of the face amount of the contracts and in computing petitioner's income he has included them at that amount except those contracts which resulted *279 in settlements and delivery of deeds before the end of 1954. Respondent's main argument in support of his position is that he so determined in his notice of deficiency and that petitioner has not carried his burden of proving otherwise. While, as we have noted, petitioner has failed to establish that the land installment contracts had no ascertainable fair market value at the date they were entered into, the evidence clearly shows that none of these contracts had, at the date it was entered into, a fair market value of its face amount. In fact from the evidence in the record it appears that probably each one of the contracts here involved might have had a different percentage of its face amount as a fair market value. We do not view this as meaning, however, that such contracts have no ascertainable fair market value. There is a decided difference in a lack of sufficient evidence to show with precision the fair market value of a contract and evidence showing that a contract had no ascertainable fair market value. Petitioner takes the position that having shown sufficient evidence to show that these contracts did not have a fair market value in the face amount thereof as determined *280 by respondent, the presumption of correctness of respondent's determination is overcome, and it is incumbent on respondent to go forward and show what the fair market value of each contract in fact was and that in the absence of such proof by respondent the Court should sustain petitioner's position that these contracts had no ascertainable fair market value. While the lack of detailed evidence with respect to each contract causes difficulty in valuing the contracts, the evidence sufficiently shows that they had some value that we consider it necessary to make some determination of that value. While the evidence is deficient with respect to the financial ability of each separate purchaser and an appraisal of each separate property, it does show generally that the purchasers were of a type who did not make substantial down payments and that the properties were in older neighborhoods. The evidence also shows that in a number of instances petitioner did in effect repossess the property by agreement with the purchaser whereby the purchaser assigned his interest under the standard land installment contract to petitioner, petitioner retaining all that had been previously paid and ownership *281 of the property. Petitioner from this evidence would draw the inference that the transaction was handled in this manner since upon foreclosure any deficiency judgment in personam which he might obtain against the purchase would be valueless. The inference petitioner draws is not one that necessarily follows for it could well be that by retaining all that had been paid by the purchaser and keeping the property petitioner obtained something of more value than the remaining unpaid balance on the contract, and under the statutes had he foreclosed on the property, the sales price received would have been sufficient to discharge the balance due under the contract and leave an excess to be paid over to the purchaser for his equity. In fact, the type of contract used by petitioner prior to the enactment of the Land Installment Contracts Law in Maryland and petitioner's efforts in all instances to obtain an assignment from the purchaser of the land installment contract indicates that this may well be true. This inference is further borne out by references in Maryland cases to the purpose of the enactment of the Land Installment Contracts Law of Maryland. In Spruell v. Blythe, 215 Md. 117, 137 A. 2d 183 (1957), *282 the Court of Appeals of Maryland held that the provision of the Land Installment Contracts Law there under consideration was a declaration of public policy of the State of Maryland. In so holding, the Court stated at page 185: It is a matter of common knowledge that at the time of the enactment of the Land Installment Contract Law in 1951 there were certain governmental controls with reference to landlords, when they leased their properties as dwellings. Not infrequently, installment purchase contracts were entered into, which required nothing, or a very small amount, as the downpayment, but called for rather substantial weekly or monthly payments, when the individual properties were considered. Many times, these contracts effectuated an evasion of one or more of the governmental controls relative to landlords; and the "purchaser" under the contract, after making many weekly or monthly payments, arrived at the conclusion, because of the amount of the purchase price, interest being paid, or other charges that he would be in a better position if he treated himself as a "lessee" and terminated the contract. This, in effect, made the purchasers lessees, and the sellers landlords who *283 were not subject to the governmental controls. As was stated by Chief Judge Brune, in Hudson v. Maryland State Housing Co., 207 Md. 320, 331, 114 A. 2d 421, 425, the Land Installment Contract Law was, "intended to curb serious actual or potential evils." * * * Insofar as the record shows it was to petitioner's advantage to persuade a purchaser to assign a land installment contract to him. However, the evidence does further show that in a number of instances when a mortgage on the property was placed with a building and loan association after substantial payments under the land installment contract had been made it was necessary to leave a portion of the mortgage proceeds hypothecated with the building and loan association. Article 21, section 112(7), of the Annotated Code of Maryland[2] with respect to land installment contracts provides that when 40 percent or more of the original cash price of the property shall have been paid, the vendee shall have the right (if no earlier period be fixed by the contract) to demand a conveyance of the premises mentioned in the contract, *284 on the condition that he execute a purchase money mortgage to the vendor, or to a mortgagee procured by the vendor. *285 One of petitioner's witnesses testified that in appraising property for the placement of a mortgage by the building and loan association which he represented and which placed a number of mortgages on properties sold by petitioner, the property was valued for the placing of a mortgage in the same manner where the sale had been made under a standard land installment contract as where a sale was being made under a conventional contract of sale of realty. It was clear from his testimony that a mortgage would not be placed in the amount of the full appraised fair market value of the property and that hypothecations were required where the mortgage was placed in excess of the amount of the percentage of the fair market value of the property which would customarily be the percentage of such value that a building and loan association would lend on the security of a mortgage on the property. The indication from this would be that at least in the instances where no hypothecation was required, the fair market value of the property at the time the mortgage was placed thereon was appraised sufficiently higher than the amount of the mortgage that no hypothecation was necessary. However, generally *286 a substantial period of time had passed between the date of entry into the standard land installment contract and the placing of a mortgage on the property. Therefore, the valuation that might be placed on the property at the time the mortgage was placed on it would not necessarily be indicative of the value of the property at the date of entry into the land installment contract. There was much conflicting testimony about the nature of the neighborhoods in which petitioner's properties were located, other than that they were older neighborhoods which appears consistently in the testimony of the various witnesses. Some witnesses indicated that generally purchasers under land installment sales contracts kept their properties well; other witnesses stated that this was not the situation. The record does not even disclose the extent to which petitioner investigated the credit standing of a prospective purchaser under a standard land installment sales contract. However, since we consider it necessary to value these contracts and there is no evidence from which they can be individually valued, we have concluded, after consideration of all the evidence, that the land installment contracts *287 entered into by petitioner on and after July 1, 1951, had a fair market value on an average of 70 percent of their face value but in no case a value less than petitioner's basis in the leasehold interest sold. [3] We recognize the deficiencies in applying an average value to each individual contract but in the absence of any evidence on which to base the value of the individual contracts, we have concluded that each standard land installment contract entered into by petitioner on and after July 1, 1951, had a value of 70 percent of its face amount (that is the principal balance shown on the contract) or petitioner's basis in the leasehold sold, whichever is greater. We hold that every sale under a standard land installment contract entered into by petitioner on or after July 1, 1951, resulted in gain or loss to petitioner at the date it was entered into in the amount by which the cash received by petitioner plus the fair market value of the land installment contract exceeded petitioner's *288 basis in the leasehold interest in the property with, of course, the necessary deduction for petitioner's expenses of the sale. We hold that respondent was in error in not considering gain or loss to result at the time of execution of a land installment contract on and after July 1, 1951, in those instances where the deed to the property was delivered in a completed transaction prior to the end of 1954 and that respondent was likewise in error in holding that gain which resulted at this later time should be computed as if the original sale had taken place at that time. Having determined that the land installment contracts had a fair market value of less than the face amount thereof, it becomes necessary to determine how the payments made on these land installment contracts after the date they were entered into should be treated. We hold that each such payment should, in accordance with the provisions of the contract, first be applied to the payment of expenses of the property made by the seller such as taxes, existing ground rents, and insurance; and secondly, applied to the interest in the amounts as hereinafter discussed. The remaining portion of each payment is applicable to *289 principal and should be prorated between income and return of basis in the land installment contract on the ratio that the face amount of the contract bears to our determined fair market value, which generally under our determination, would result in 30 percent of the amount representing income and 70 percent return of basis in the contract. Since we have determined the fair market value of the contract to be other property received by petitioner on the sale, we see no difference in petitioner's situation with respect to these contracts and the situation that exists where a purchaser of such land installment contracts at a discount collects on such contracts. In Darby Investment Corporation, 37 T.C. 839 (1962), affirmed per curiam 315 F. 2d 551 (C.A. 6, 1963), we held that each payment on such a land installment contract, after deduction of interest, included realized discount income in proportion to the difference between the taxpayer's cost and the principal balance due upon the face of such instrument at the date of the taxpayer's purchase thereof, or stated another *290 way, that part of each payment was a return of principal and part a receipt of income. When a land installment contract entered into on or after July 1, 1951, terminates in a delivery of a deed and the placing of a mortgage on the property in one of the taxable years here involved, the gain realized from this completed transaction is the difference between the total of (1) the amount received in cash by petitioner at the closing date plus (2) the fair market value of the hypothecation, which issue is discussed later in this opinion, plus (3) any amounts retained as interest or ground rent by petitioner at the closing in excess of the amounts which in the later discussion in this opinion we hold is current income in each year to petitioner as properly applicable to payment of an existing ground rent and petitioner's remaining basis in the land installment contract. We are aware that respondent has argued that the evidence in the record is insufficient to make a computation such as we have outlined above in every instance with respect to land installment contracts. However, on reviewing the evidence it appears to us that there is sufficient evidence in the record to make this computation *291 in most if not all instances. In any case of a transaction which was completed by the delivery of a deed and acceptance of a mortgage during one of the taxable years here involved where the evidence in the record does not permit making the computation outlined above, the computation as made by respondent of the income resulting from this transaction will be used and no income included in the year that the land installment contract was entered into solely because of failure of proof on the part of petitioner to show in such instance that respondent's computation was in error, except that the adjustment with respect to the portion of the basis applicable to the retained ground rent as hereinafter discussed should be made. Many of the standard land installment contracts entered into by petitioner after July 1, 1951, are in evidence in a stipulated joint exhibit which has been incorporated herein by reference, and they show the agreed amount of weekly, bi-monthly, or monthly payments to be made. The stipulated exhibits showing respondent's computations of income on sales under land installment contracts and interest on payments under such contracts show information as to the date of *292 entry into these contracts and the year during which payments thereon were made. The agreed exhibits also contain some of the ledger sheets showing collections on these contracts and although certain alterations were made on the ledger sheets, the alterations were in connection with expense items and the evidence shows that the collections as shown on petitioner's ledger sheets were substantially correct. If, with respect to any contract, the collection sheet, ledger sheet or other document showing collections is not among the stipulated or agreed exhibits, because of this deficiency in proof, it will be assumed, for the purpose of the recomputation to be made by the parties, that payments were made in accordance with the agreement in the land installment contract, except in those instances where agreed exhibits show to the contrary. The next issue between the parties with respect to the proper amount of petitioner's income from the sale of properties during the years here involved is the manner in which petitioner's bases in the properties should be distributed between the leasehold interest which he sold and the fee in the property which he retained by creating a ground rent with *293 respect thereto. As we held in Welsh Homes, Inc., supra, the reversionary interest and the leasehold interest under Maryland law are separate properties which may be subjects of separate sales and the disposition of the leasehold interest is to be accounted for when sold in the same manner as the sale of any other interest in property. Our decision in Welsh Homes, Inc., supra, was based on a computation under Rule 50 allocating that portion of the basis to the leasehold which the selling price of the leasehold bore to the sum of the selling price of the leasehold plus the value of the remainder interest computed by capitalizing the annual ground rent at 6 percent, or in effect, the ratio of the value of the leasehold to the value of the whole property. In affirming our decision, including the approval of the computation of tax under Rule 50, the Circuit Court quoted with approval the following statement in our opinion: Upon the creation of the ground rent, there are two interests in the property; the reversion, owned by the grantor, and the leasehold, owned by the purchaser. * * * The purchaser has, in reality, a dual standing; he is the owner of the leasehold interest in the property *294 and he is the lessee of the reversionary interest. The grantor is the owner of the fee and the lessor of the reversionary interest. The Circuit Court then stated with respect to allocation of the basis in the whole property between leasehold and fee interests: Allocation of costs is normally employed for the establishment of a cost basis of property when a taxpayer acquires an aggregate of assets for a single unallocated purchase price and subsequently sells a portion of the whole. 3 Mertens, Law of Federal Income Taxation, section 21.23. The pending case presents the reverse of the situation. The cost of the land and the cost of the building, the constituent elements of the property which the builder has acquired are known, but in the building operation they have been incorporated into a single property and when a part interest in the whole - the leasehold - is granted to the lessee and the reversionary interest or ground rent is retained by the lessor, it is impossible to ascertain what part of the value of these interests is attributable to the land and what part to the building. It follows that the cost of land and building must be allocated between the interest granted and *295 the interest retained. The taxpayer's contention that the allocation of costs is not necessary must be rejected since it is based on the mistaken notion that the purchaser of the leasehold acquires an interest in the building but no interest in the land. In various types of situations, more or less analagous to that in the pending case, the allocation of costs or expenses has been approved when it is the only practicable method of reaching a fair and equitable result. * * * In the instant case petitioner does not contend that properties he bought in fee should not have the basis allocated on the method approved by this Court and the Circuit Court of Appeals in Welsh Homes, Inc., supra. He contends, however, that where he purchased a leasehold interest and subsequently, but prior to the sale of the property, redeemed the existing ground rent, that when he subsequently sold a leasehold interest subject to a ground rent, either created or to be created, in an amount in excess of the ground rent payable with respect to the reversionary interest which he redeemed, no allocation between leasehold interest sold and reversionary interest retained is necessary. Petitioner states that under *296 these circumstances his basis for the leasehold interest is his cost of that interest and his basis for the reversionary interest is the redemption price he paid for the reversionary interest. Petitioner's view is that at such time as he sells the reversionary interest or such interest is redeemed by the purchaser of the leasehold estate, he realizes a gain therefrom of the difference in the amount he paid to redeem the ground rent existing when he bought the leasehold and the amount he receives in payment for or redemption of the ground rent he created when he sold the leasehold interest. Respondent on the other hand takes the position that when petitioner, the owner of the leasehold, redeemed the reversionary interest, the two interests in the property merged into one and the cost of the leasehold plus the cost of the reversionary interest thus becomes the basis to petitioner of the entire property in fee simple. Respondent contends that the circumstances here are not as a matter of law distinguishable from the situation involved in Welsh Homes, Inc., supra, where land was purchased at a stated price, a house built on the land, and a ground rent carved out of the whole with the *297 seller retaining a reversionary interest and receiving a ground rent. We agree with respondent that under Maryland law a leasehold interest is terminated by merger into the reversion. Story v. Ulman, 88 Md. 244, 41 A 120 (1898), and Starr v. Ministers and Trustees of Starr Methodist Protestant Church in Baltimore City, 112 Md. 171, 76 A 595 (1910). The problem here is whether because of this merger of interests, an allocation of basis is necessary when a new ground rent is created upon the sale of a leasehold, the vendor retaining the reversionary interest which under Maryland law is capitalized at 6 percent and thus has a redemption value in excess of the amount the vendor paid for the previously existing reversionary interest. Under our reasoning and that of the Circuit Court in Welsh Homes, Inc., supra, that upon creation of the ground rent there are two interests in the whole property, and considering that prior to the creation of such ground rent the ownership of the whole property has been merged into one fee simple interest owned by petitioner, we consider *298 it necessary here to allocate on the same basis as was done in Welsh Homes, Inc., supra. Here, as there, it is the only practical method of reaching a fair and equitable result. Whereas the taxpayer's contention in Welsh Homes, Inc., supra, that an allocation is not necessary was not approved since it was based on the mistaken notion that the purchaser of a leasehold acquires an interest in the building but no interest in the land, likewise here the petitioner's contention is based on the mistaken notion of a separate disposition of two existing properties whereas because of the merger of interest prior to the disposition by petitioner of any interest in the property, petitioner has here, as did the taxpayer in Welsh Homes, Inc., supra, sold a carved out interest or partial interest in the total property he owns in fee simple and retained a reversionary interest, both the interest sold and the interest retained being in the whole property. We hold that petitioner's bases in all properties that he owned in fee simple at the time he sold them, whether the gain from the sale is to be determined as of the time of the execution of the land installment contract, or whether the sale is *299 one on which the gain is to be determined at the time of the completed transaction with delivery of deed, should be allocated between the leasehold interest sold and the reversionary interest retained on the ratio of the sales price of the leasehold interest to the value of the whole property, computed by adding to the sales price of the leasehold interest the amount of the ground rent capitalized at 6 percent. Welsh Homes, Inc., supra. We agree with petitioner that the allocation of basis in property between the leasehold interest sold and the reversionary interest retained should be made with respect to each separate property sold and not on an overall basis for all properties sold for a particular year and such separate allocation may be made by the parties in their respective computations under Rule 50. Petitioner's objection with respect to respondent's computation of his understatement of income from sales of properties which he reported on his income tax returns in each year, and respondent's computation of income from sales of properties either omitted from petitioner's income tax returns or reported in the wrong year, is twofold. First, petitioner contends that while *300 respondent eliminated from costs in such transactions personal items charged on the ledger sheets, respondent has not eliminated items incorrectly included in income, which items petitioner states consist of accumulated interest, ground rents, and rental income which was received by petitioner with respect to certain of the properties prior to the time of the settlement. Petitioner's second objection to respondent's computation is that respondent has included the gain on certain properties which were not sold by petitioner in the years here involved. The evidence sustains petitioner's contention that the sale of 1914 North Payson Street and 1826 West Saratoga Street actually occurred in 1949 and therefore no gain from these sales should be included in computing his 1950 income. We have made specific findings of fact with respect to the church property located at 1204-1206 Eutaw Place and the Warner Street property which dispose of these issues on a factual basis and have also found facts which similarly dispose of petitioner's contentions with respect to the Price's Cove properties. Respondent conceded at the time of the trial some of the other adjustments such as that covering the *301 property at 1733 South Hanover Street and several similar items. All of these adjustments may be made in a recomputation under Rule 50. The evidence does not support petitioner's contention that some rentals received on properties rented prior to settlement were included with receipts of sale, nor with respect to the sale of the properties at 1805 Penrose Avenue and 405 Old North Point Road being taxable transactions in the year 1955 and not 1954. However, if these properties were the subject of a standard land installment contract entered into after July 1, 1951, they, of course would be includable on that basis, and proper adjustment, as heretofore outlined, of the gain realized on the delivery of the deed in 1954 should be made. As to petitioner's overall objection that respondent has erroneously included amounts of accumulated interest and ground rents in petitioner's receipts in computing the gain, petitioner is partially correct. Respondent's treatment of interest which was properly reportable in prior years, the amount of which will be determined hereinafter in this opinion, as part of the receipts in the year the transaction was finally closed is in error. Respondent contends *302 that the record does not show that any of the completed transactions were the subject of prior land installment contracts. This is not factually correct. There are in evidence some of the settlement sheets and some land installment contracts which show that some of the completed transactions by delivery of deeds were in fact the subject of land installment contracts either before or after 1950. Where sales were of property which had originally been the subject of a land installment contract entered into either prior to July 1, 1951, or thereafter, and total payments received prior to the date of the final closing of the transaction had not exceeded petitioner's basis in the property, the proceeds from sale as determined by respondent should be reduced by the portion of the payments on the land installment contracts which represented interest properly includable in each year while such payments were being collected as hereinafter discussed. The fact that petitioner originally reported proceeds on a different basis does not in any way bar him from now having a redetermination of his tax on a proper *303 basis. Cf. Howard H. Perelman, supra.Amounts allocated to interest in excess of the amounts of interest properly includable in prior years, whether such years were prior or subsequent to 1950, were properly included by respondent as part of the price paid by the purchaser at the time of the completed transaction. We do not think there was error in respect to respondent's handling of the amounts designated as "ground rent" with respect to completed transactions on land installment contracts entered into prior to July 1, 1951, since as we will subsequently discuss we do not believe such ground rents were properly to be accounted for on a yearly basis. Ground rents paid in instances where petitioner was still paying an equivalent amount of ground rent to another owner of the reversionary interest should in each year be offset by the payment by petitioner of ground rent. However, no different result is reached by the accumulation of petitioner's payment as an expense and the ground rent received item as a receipt in the year of settlement since the two cancel each other out. Since, as we discuss hereinafter, the ground rents charge under contracts entered into subsequent *304 to July 1, 1951, as ground rents to be created are income in the year received, respondent's inclusion of such amounts as receipts on purchase price when a completed transaction occurred is in error. Our conclusions with respect to the reported transactions are equally applicable to the unreported transactions and to the transactions reported in the name of Standard Liquidators, Inc.
The final contention of petitioner with respect to the computation of income from the various properties where a deed was delivered is that no amount of an original hypothecation should be included at that time since such original hypothecation had no ascertainable fair market value, and in the alternative if it did have such a fair market value, it was not in the amount of 50 percent as determined by respondent. We think the evidence clearly shows that the hypothecations did have an ascertainable fair market value. Several witnesses who testified with respect to hypothecations referred to the fact that they were purchased and sold. Different witnesses had different opinions as to the value of such hypothecations and the witness who appeared most qualified to testify in this regard estimated that such *305 hypothecations would range in value from 30 to 90 percent of the face amount thereof depending upon varying circumstances. He listed five such circumstances in particular which were (1) the length of time over which the mortgage that the hypothecation secured was to be paid, (2) the amount of the mortgage on the property, (3) how much money was hypothecated, (4) the condition and fair market value of the property, and (5) the credit standing of the mortgagor. This witness testified that he had over many years starting with about 1916 until a regulation prohibited a person in his position from doing so, bought hypothecations regularly. He also had been in a position to observe purchases and sales of hypothecations. The many factors which govern the value of hypothecations have not been shown with respect to each of the original hypothecations here involved, and since petitioner has failed to show error in the value determined by respondent, we sustain respondent on the inclusion of the hypothecations at a value of 50 percent of the face amount thereof in computing the gain in connection with so-called completed transactions. The next issue raised by petitioner involves the computation *306 by respondent of interest. Petitioner takes issue with respondent in three respects. First, petitioner contends that the portion of each payment on a land installment contract which properly represents interest is an amount computed on a declining balance and not a yearly amount computed on the total stated purchase price less the down payment as respondent has determined. Petitioner's second contention in regard to interest is that amounts listed as yearly ground rents to be created should not be included as further interest on land installment contracts in each year during which collections were being made on that contract. The third error which petitioner points to in respondent's computation of interest is the inclusion in petitioner's income in each year of the interest credited by building and loan associations on petitioner's purchased hypothecations and original hypothecations. The provision contained in the sales contract generally used by petitioner prior to July 1, 1951, provided as follows with respect to interest: * * * the buyer is to pay interest on the unpaid purchase price at the rate of…. per cent per annum * * * Immediately preceding this would be set forth *307 that the leasehold property had been sold to the buyer for a stated sum, of which the buyer had paid a stated sum on account of the purchase price and that the balance of the purchase price was to be paid by the buyer in weekly payments of a stated amount. This contract is ambiguous as to whether interest was to be paid on the total unpaid purchase price as of the date the contract was entered into or on the declining balance, and since in fact, when a final settlement of the property and a delivery of deed was made petitioner credited to interest a percentage of the original unpaid purchase price for each year during which payments had been made, we hold that with respect to contracts entered into prior to July 1, 1951, respondent did not err in including as interest income on land installment contracts in each year the amount of the interest percentage stated in the contract applied to the unpaid amount of the purchase price. However, of course, as previously noted, at the time of delivery of the deed in a completed transaction, no portion of the accumulated interest should be included as part of the receipts of the sale. Where these contracts were entered into prior to 1950 and *308 no interest was reported in years prior to 1950, this omission from income of interest during those years does not justify an inclusion of such interest in one of the taxable years here involved. Cf. Howard H. Perelman, supra. The contracts entered into prior to July 1, 1951, made no mention of payment of ground rents or ground rents to be created. The only mention was that from the weekly payments made by the buyer the "seller shall pay the expenses on the property such as taxes, ground rent, insurance." Therefore, under this contract petitioner should have collected no ground rent in addition to amounts paid out by him on existing ground rents. Consequently, no yearly amounts should be included as an equivalent of interest with respect to any ground rents under these contracts. If, in fact, when a settlement occurred an amount of the payments previously made by the purchaser was allocated to ground rents and such amount was in excess of ground rents actually paid out by petitioner or such an allocation was made where petitioner owned the fee and no ground rent was being paid by petitioner, then such excess amount or such total amount which was removed from the amount *309 of the purchaser's payments which was credited to the purchase price of the property should, as we have heretofore held, be included as a part of the receipts by petitioner for the property in computing petitioner's gain on the sale. The provisions of the standard land installment contracts which were used by petitioner with respect to all sales on and after July 1, 1951, provided that the installment payments shall first be applied by the seller, to the payment of taxes, "ground rent, if any, paid by the Seller" insurance premiums, and "interest on unpaid balance owed by the Buyer." In these contracts generally petitioner provided an amount of annual ground rent "to be created by a lease redeemable 5 years after date of lease at 6% capitalization upon 30 days notice in writing" in the description of the property and under the printed designation in the contract "Annual Ground Rent (if any)" would place the same figure for ground rent as was placed in the typed description of the property. In most of these situations, petitioner was not actually paying any ground rent with respect to the property but owned the property in fee simple. Why respondent treated such amount as interest *310 income is not clear. It is not in fact either interest or ground rent but an agreed yearly payment which is not to be used to reduce the principal indebtedness. There was some suggestion in the testimony of one of the witnesses that perhaps such provision in the contract was not "enforceable" and that therefore if upon a settlement a purchaser questioned this item he would make the best adjustment he could on behalf of petitioner. However, petitioner has directed our attention to no specific authority holding such a contract invalid and readily admits that generally speaking the entire amount stated as a ground rent to be created by a lease was not allocated in discharge of the principal balance of the purchase price at a settlement of the property. Under Article 21, section 112, of the Annotated Code of Maryland, dealing with land installment contracts, provision is made for contents of the contract and item (h) specifies: "The interest on the unpaid balance not to exceed 6 percent per annum, ground rent if any, taxes and other public charges." Article 21, section 111, provides that every land installment contract shall be evidenced by an instrument in writing, signed by all of *311 the parties thereto, containing all of the items to which they have agreed. Petitioner has directed our attention to nothing that would make this provision of a contract for payment of an amount as ground rent on a lease to be created necessarily invalid and certainly nothing that would make the contract void as distinguished from voidable. See Hudson v. Maryland State Housing Company, 207 Md. 320, 114 A. 2d 421 (Ct. App., Md., 1955). Under these circumstances we think respondent was justified in including the amount stated as payments on ground rent to be created in the standard land installment contracts as income in the year received. Of course, this same amount is not includable as receipts when a completed transaction occurs by the delivery of a deed. Furthermore, the total payments received under any land installment contract in each year should be reduced by this amount before allocation of the principal payments between return of basis and income. The land installment contracts entered into on July 1, 1951, and thereafter are clear that 6 percent interest is payable on the unpaid balance of the contract price and interest on the declining unpaid balance of the *312 contract price is the amount properly includable in each year in petitioner's income. If, when the settlement took place and a deed was delivered, an amount was allocated to interest in excess of interest at 6 percent on the unpaid balance of principal for the years during which payments were made under contracts entered into after July 1, 1951, this excess constitutes an additional amount received by petitioner for the property to be allocated to receipts from sale of the property at that time. Petitioner contends that the agreed exhibits and agreed facts in the record are sufficient to permit the computation of the interest on the unpaid principal balance under the installment contracts. Certainly, in many instances this information is in the agreed exhibits, and therefore, this computation may be made under Rule 50. To the extent, in any instance, that the record lacks the information to make such a computation, respondent's computation will be accepted because of the failure of petitioner to produce the evidence to show error in the amount used by respondent. The evidence shows that except where the mortgage was in default, interest on hypothecations, both purchased and original, *313 could be withdrawn by petitioner just as any other interest on a savings account in a building and loan association. Petitioner has produced no evidence to show that in any instances where respondent included interest on such hypothecations in his income in the year when it was credited to his hypothecated account, the mortgage which such hypothecation secured was in default. Therefore, we sustain respondent in his determination that such interest is includable in petitioner's income in the year credited to his hypothecated building and loan account. Of course, no portion of the interest should be included in determining the gain to petitioner when the hypothecation is released, but we do not understand that respondent has in fact so included it. Petitioner's next specific contention is that respondent incorrectly computed his income with respect to ground rents created prior to 1950 where the reversionary interest was either redeemed or sold during the taxable years here involved. The evidence shows that respondent used a zero basis for such reversionary interests in his computation of petitioner's income from such sale. Upon the sale of the leasehold interest and the creation of *314 a ground rent prior to 1950, an apportionment should have been made of petitioner's basis in each property in fee between the leasehold interest sold and the reversionary interest retained in accordance with the decision in Welsh Homes, Inc., supra. Even though no such allocation was actually made, the portion of such basis properly allocable to the reversionary interest should be deducted in computing petitioner's gain on the sale or redemption of such reversionary interests, and respondent is in error in using a zero basis. The primary difficulty in this situation is in determining what portion of petitioner's basis in the whole property should have been allocated to the reversionary interest. There are very few of such ground rents with respect to which the evidence contains sufficient information to make the proper allocation. Petitioner's returns for the years prior to 1950 are in evidence, and they list the properties reported as sold showing cost, selling price, and profit. We recognize that the evidence shows that costs as shown on these returns are in many instances overstated. Nevertheless, we think that weighing heavily against petitioner for failure of precise proof, we *315 should make some determination of an amount of basis to be allocated to these reversionary interests sold or redeemed during the years here involved. Realizing that the amount we determine is probably less in every instance than the appropriate amount, but considering the unreliability of costs as shown on petitioner's income tax returns for years prior to 1950, we hold that where the evidence does not show sufficient facts from which to make a proper determination of the basis for the reversionary interest when ground rents were created prior to 1950 and sold or redeemed during the years here involved, that 50 percent of the sale or redemption price shall be considered as basis and 50 percent as profit. The computation of gain either on the basis determined under the allocation approved in Welsh Homes, Inc., supra, or on the basis of using 50 percent of the redemption price as the basis of the reversionary interest may be made under Rule 50. The fact that petitioner's income in prior years was understated by not properly reporting gain on the leasehold estate by making such an allocation does not justify increasing income in the years here involved by inclusion of an amount which *316 was in fact income unreported in prior years. The next specific item contested by petitioner is the income as computed by respondent upon release by building and loan associations to him of part or all of the hypothecations which he had in such building and loan associations, either purchased or original. It is petitioner's contention that he received no amount of income with respect to either purchased or original hypothecations until he had recovered his entire basis therein, and he further contends that the gain from purchased hypothecations constituted long-term capital gain. We think it clear as we have previously discussed that the original hypothecations and purchased hypothecations did have a fair market value. We have for original hypothecations originated in the years here involved, sustained respondent's determination of a fair market value of 50 percent of the face amount because of failure of proof by petitioner that this amount is not correct. We also think it clear that the purchased hypothecations had a fair market value of the amount paid by petitioner therefor. We therefore sustain respondent on his method of allocating any releases on hypothecations between return *317 of principal and income on the ratio that the face amount of the hypothecation bore to petitioner's basis therein. Key Homes, Inc., 30 T.C. 109 (1958), affd. 271 F. 2d 280 (C.A. 6, 1959); and Darby Investment Corporation, supra.The fact that the hypothecations had an ascertainable fair market value and there existed the likelihood of eventual payment in full distinguishes this case from Phillips v. Frank, supra, and Morton Liftin, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963). Petitioner attempts to distinguish Key Homes, Inc., supra, and Darby Investment Corporation, supra, by saying that petitioner's method of accounting here makes these cases distinguishable. Petitioner does not discuss the reasoning back of this contention, but it may be noted that although the taxpayer involved in Key Homes, Inc., supra, was on an accrual basis of accounting, the Darby Investment Corporation accounted for and reported its income on the cash receipts and disbursements method. Although Key Homes involved hypothecations similar to those involved in the instant *318 case and Darby Investment Corporation involved payments on land installment contracts, the principle of the time of realization of income is the same under either circumstance as is pointed out in Darby Investment Corporation, supra. Petitioner's contention that the income from release of purchased hypothecations is capital gain is clearly erroneous for a number of reasons but suffice it to say that the release by a building and loan association of a hypothecation was a collection on an indebtedness and not a sale or exchange of a capital asset and therefore for this reason alone the receipt did not result in capital gain. See William A. Tombari, 35 T.C. 250, affd. 299 F. 2d 899 (C.A. 9, 1962), and A. B. Culbertson, 14 T.C. 1421 (1950). Petitioner also states that respondent incorrectly failed to assign any basis to hypothecations which he made prior to 1950, but instead considered the entire collection thereon as income. Respondent attempts to justify this by stating that petitioner has not shown the fair market value of original hypothecations which were originated prior to 1950. The evidence shows that over a period of *319 years starting many years prior to 1950, generally hypothecations had a fair market value of from 30 to 90 percent of the face amount thereof. The evidence also shows that the type of customers for petitioner's properties and the type of properties sold by petitioner were substantially the same for years prior to 1950 and years subsequent thereto. Furthermore, the evidence shows that generally prior to 1950 petitioner sold his properties under a form of land installment contract which indicates that by the time a mortgage was placed on the property some knowledge of the credit rating of the purchaser existed. The evidence shows a number of hypothecations purchased by petitioner, himself, in years prior to 1950 and the amounts he paid therefor. Considering all this evidence and weighing heavily against petitioner because of deficiencies in the evidence, we hold that original hypothecations created by petitioner prior to 1950 had a fair market value at the time they were created of 40 percent of their face value, which amount should have been included at the time of the settlement of the transaction as a part of the receipts of sale and thus included in income in those years and constitute *320 the basis of the hypothecation for collections made during the years 1950 through 1954. In the recomputation under Rule 50, a basis of 40 percent of the face amount thereof should be assigned to hypothecations originated by petitioner prior to 1950 and collections during the years here involved prorated 40 percent to return of basis and 60 percent to income. Petitioner's final contention with respect to respondent's computation of income from hypothecations is that no income resulted from the release of a hypothecation when petitioner took over or purchased the mortgage from the building and loan association and because of his assumption or purchase of the mortgage, his hypothecation was released. Petitioner points out that whenever he assumed or purchased such a mortgage, it was because the mortgage was in default and the building and loan association was considering commencing foreclosure procedures. Petitioner argues that the gain from the release of the hypothecation should be considered as a reduction in his basis for the mortgage. However, the release of the hypothecation and the purchase of the mortgage are separate transactions. See Jacob M. Dickinson, Jr., 18 B.T.A. 790 (1930). *321 Petitioner has not shown in any instance that any mortgage he assumed or purchased did not have a fair market value of its face amount or the amount he paid therefor and has therefore not shown any loss on such mortgages to offset any income resulting from the release of his hypothecations. In fact the evidence is not even clear which hypothecations, if any, were released to petitioner because he assumed or purchased a mortgage in order that the mortgage would not be foreclosed by a building and loan association. Under the circumstances here present, petitioner has shown no error in respondent's computation with regard to releases of hypothecations where he assumed or purchased the mortgage. The next contention by petitioner is that respondent has not allowed in each of the years here involved a proper amount of deductions for expenses for taxes, insurance, ground rent, depreciation, commissions paid, repairs and other current expenses. This is raised both in connection with rental properties where the amount of rent received is not in issue, and with respect to gains from sales under land installment contracts. With respect to the rental properties the only item which petitioner *322 has set forth in his brief as not being properly allowed as expenses against the rental income as determined by respondent is depreciation. Petitioner claims that depreciation should be computed at the rate of 8 percent per year on the rental properties instead of the 4 percent generally used by respondent. The only evidence offered by petitioner to support this contention is a statement by petitioner, himself, and an employee and an agent of petitioner that in their opinion the useful life of the properties rented was from 10 to 15 years. There was so little support for the opinions given by these witnesses that under any circumstances they would be entitled to little, if any, weight. However, other facts in the record show that these rental properties were in the same general type neighborhood as the properties sold by petitioner. The properties sold were under contracts to extend over a period of years and mortgages were placed thereon by building and loan associations repayable over a period of years. This evidence indicates that the opinions of petitioner's witnesses are not valid estimates of the useful life of the properties. Since petitioner has failed to establish any useful *323 life of the properties, we sustain respondent's determination of useful life because of petitioner's failure to show error therein. One of the expenses for which petitioner contends he is entitled to a deduction with respect to leasehold interests sold under land installment contracts is depreciation. We do not agree with petitioner's contention in this regard since upon the sale of the leasehold under a land installment contract, all interest in such leasehold except the bare legal title which is held by petitioner as security for the land installment contract passes to the purchaser so that the depreciation in the property would be the purchaser's and not petitioner's. Although petitioner remained the owner of the reversionary interests, see Welsh Homes, Inc. v. Commissioner, 279 F. 2d 391 (C.A. 4, 1960), affirming 32 T.C. 239 (1959), petitioner has failed to show the depreciation, if any, applicable to such reversionary interests. We therefore hold that petitioner is not entitled to any deduction for depreciation with respect to the properties sold under land installment contracts. The expense items which petitioner says have not been allowed by respondent *324 with respect to properties sold under land installment contracts are real estate taxes, ground rents, insurance, mortgage interest, commissions, and repairs. Petitioner further contends that respondent has not allowed petitioner proper business expense deductions for advertising, foreclosure expenses such as court notices and the like, and miscellaneous expenses. With respect to the items of advertising, foreclosure expenses, and miscellaneous expenses, there is no evidence to support petitioner's contention that the business expense deductions allowed by respondent did not cover these items in each of the years here involved. As we pointed out in connection with the method of computation of income from payments after sales by land installment contracts, the payments should first be reduced by the amount of such payments which are to be applied by petitioner (the seller) to real estate taxes, ground rent, and insurance. This computation may be made under Rule 50. Therefore, petitioner would not be entitled to an additional deduction for such amounts since the payments on the land installment contracts have reimbursed him for his payments. The testimony of petitioner's accountant who *325 prepared the exhibit of expenses was that mortgage interest, commissions, and repairs came from the ledger sheets and that these items would have been included in cost when a completed transaction was carried into income by petitioner, but since respondent has determined that income was received when the contract was entered into, these items should be currently deductible. Since we have held that the contracts entered into by petitioner prior to July 1, 1951, did not constitute property with any fair market value so that no income was received by petitioner until payments exceeded his basis in the property, or a so-called completed transaction was effected, any items involved in contracts entered into prior to that time would, of course, have to be considered either when a completed transaction occurred or total payments after allocations of payments which were reimbursements to the seller exceeded petitioner's basis in the property. However, with respect to contracts entered into after July 1, 1951, petitioner would be correct in principle in his contention that the items would be deductible expenses if the evidence were sufficient to support a finding that petitioner actually paid *326 such amounts during the years involved. Since petitioner is on a cash basis, of course, he would only be entitled to any deduction to the extent the amount was paid. The falsification of the ledger sheets by petitioner and charging of items of personal expenses thereto causes the expense side of these sheets to be totally unreliable. The parties have agreed to such items of personal expenses included on the ledger sheets as business expenses with respect to the completed transactions during the years here involved, but the evidence in no way shows that the items on other ledger sheets were in fact correct nor does it show that petitioner in fact paid commissions as distinguished from setting up an account for commissions when a standard land installment contract was entered into. Furthermore, the evidence does not show that in determining the basis of the property which he used in computing gain where a sale under a land installment contract occurred, respondent has not included commissions as part of the basis. [4] Under the standard land installment contract repairs should have been made by the purchaser, and if in fact petitioner had made any repairs, he should have been reimbursed *327 therefor by the purchaser and the evidence does not show that any such repairs were made or if made that petitioner was not reimbursed. *328 There is some indication in the record that petitioner was paying some mortgage interest on certain of his properties where he had sold the leasehold interest and retained the reversionary interest. Although the proof is not completely satisfactory as to the amount or that the correct amount of such mortgage interest was entered on the ledger sheets, there is sufficient showing to justify us in holding that petitioner is entitled to business expense deductions in the amounts of $138.40, $4,241.88, $4,772.94, and $4,751.93 for the years 1951, 1952, 1953, and 1954 as mortgage interest paid by him in addition to the amounts of business expense deductions allowed by respondent in the statutory notice of deficiency. Petitioner has otherwise failed in his burden of proof with respect to claimed additional deductions. Petitioner next contends that respondent did not allow adequate deduction for his personal deductions in each year. He takes the position that whereas for the years 1950, 1953, and 1954, his itemized deductions do not exceed the standard deductions allowed by respondent, that for the years 1951 and 1952, he should be allowed itemized deductions of $2,322.77 and $2,803.84, *329 respectively. For the year 1951 petitioner claims as personal deductions $627 as charitable contributions and $1,610.52 as taxes. The only portion of this which respondent disallowed in the notice of deficiency was $371 of the claimed charitable deductions, and petitioner has failed to show error in this disallowance. Petitioner on his return claimed only $299.62 as real estate taxes on his residence and now claims that this amount should be $395.87 but has offered no valid evidence to substantiate this additional claim. We therefore sustain respondent with respect to the amount of personal deductions which he has allowed to petitioner for the year 1951. For the year 1952 petitioner on his return claimed personal deductions of $675 for charitable contributions and $495.19 for taxes. Respondent allowed petitioner the standard deduction of $1,000 with the explanation that allowable itemized deductions totaled only $775.19. The main item which is increased by petitioner in the itemized deductions which he now claims as compared to those claimed on his return is an item of interest of $220.09 stated to be paid to the Internal Revenue Service and an item of Maryland income tax in the amount *330 of $1,546.15 as compared to the $187.59 claimed as a deduction by petitioner on his income tax return. Petitioner now claims charitable contributions in 1952 of $730. Petitioner's accountant testified that he had accepted petitioner's statement in connection with a $300 amount claimed to be deductible in 1952 that the amount was used for a charitable purpose. Petitioner's records showed that payment to be to an individual. This is not sufficient proof to substantiate that the $300 amount was in fact paid for charitable purposes. Both on direct examination and on cross examination petitioner's accountant witness stated that all the personal deduction items which were shown on the schedules which he had prepared came from records which were in the courtroom and subject to check by respondent. Under these circumstances we accept the schedules as prepared and hold that petitioner has substantiated an interest payment of $220.09 and a payment of Maryland income tax in the amount of $1,546.15 during the year 1952, making a total increase in personal deductions over those as determined by respondent of $1,578.65 ($1,546.15 - $187.59 + $220.09), which when added to the $775.19 determined by *331 respondent as petitioner's itemized deductions total $2,353.84. We therefore hold that for the year 1952 petitioner is entitled to personal deductions of $2,353.84 in lieu of the standard deduction of $1,000 allowed by respondent. Petitioner contends that respondent incorrectly computed the capital gain realized on the sale of his personal residence by not allowing sufficient basis for repairs and capital improvements which had been made by him prior to the sale. The ledger sheet, if one ever existed with respect to petitioner's personal residence, was not produced at the trial, and petitioner's claim for increased basis was entirely grounded on an estimate given in his testimony. This estimate apparently included repair items throughout the years while petitioner was occupying the premises as a personal residence as well as capital improvements made during this same period of time. This evidence is insufficient to show any error in the amount allowed by respondent for capital improvements to the property after it was purchased by petitioner. We therefore sustain respondent's computation of petitioner's capital gain from the sale of his personal residence for failure of proof by *332 petitioner that this determination is in error. Petitioner has offered no evidence to show that respondent was in error with respect to additions to tax for substantial underestimation of estimated tax for the years 1951 through 1954 except as the amount of such additions might be reduced because of a reduction in each of the years in the total deficiencies determined. We therefore sustain respondent in his determination of this addition to tax and the amount of this addition may be computed by the parties in the Rule 50 computation. Decision will be entered under Rule 50. Footnotes
1. Annotated Code of Maryland (1957), Art. 21, secs. 110-116.↩
2. (7) Purchase money mortgage when forty percent of original cash price is paid. - When 40% or more of the original cash price of the property shall have been paid, the vendee shall have the right (if no earlier period be fixed by the contract) to demand a conveyance of the premises mentioned in the contract, on the condition that he execute a purchase money mortgage to the vendor, or to a mortgagee procured by the vendee. When any mortgage is executed in pursuance of the vendee's demand for conveyance under this subsection the vendee shall be liable for such expense as title search, drawing deed and mortgage, one half of cost of federal and State revenue stamps, notary fees, recording, reasonable building association fees, judgment reports and tax lien report. In any such mortgage the required periodic principal and interest payment to be made by the mortgagor shall not exceed the periodic principal and interest payments otherwise required by the land installment contract, except with the consent of the mortgagor; such consent may be evidenced by the execution of a mortgage. Such mortgage shall contain the usual covenants by the mortgagor for the payment of the mortgage debt, the taxes on the mortgaged property and the ground rent, if any, and the premiums on fire and extended coverage insurance in an amount equal to the mortgage indebtedness, if obtainable, and if not then in the highest amount of such insurance obtainable. It shall also contain the usual remedies upon default by way of a power of sale to the mortgagee, his assigns or his attorney and/or a consent by the mortgagor to a decree for sale in pursuance of sections 6 to 16, inclusive, of Article 66 or any amendments thereof. The deed and mortgage executed in pursuance of this section shall entirely supersede the land installment contract.↩
3. An issue in this case which will be hereinafter discussed is the proper method of allocation of petitioner's total basis in the properties between the leasehold interest sold and the fee retained.↩
4. Petitioner's witness who testified in this regard stated in response to questions from the Court: (Transcript 1,888-1,889) THE COURT: * * * Do you know what these items of commissions were that were on these various sheets? THE WITNESS: Yes, your Honor. THE COURT: What were they? THE WITNESS: They were payments made to employees of Mr. Kaufman or to outsiders, at the rate usually of two and a half percent of the contract price. THE COURT: For negotiating one of these standard land installment contracts? THE WITNESS: Yes, your Honor. I might add in many instances it was almost equal to the down payment. THE COURT: Well now as far as you know, do these exhibits to the statutory notice - I forget what exhibit it is - running from A through S or something, with subnumbers, is there any exhibit in this statutory notice that gives credit for these commissions against anything insofar as you know? THE WITNESS: No, your Honor. They might be reflected as part of the cost of the items on exhibit Q. THE COURT: You don't know whether they are reflected as part of the costs on exhibit Q or not? THE WITNESS: I don't know of my own knowledge. THE COURT: And exhibit Q is the one that deals with the profits on these land installment contracts? THE WITNESS: Yes, your Honor.↩